IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 05-515 T
(JUDGE ALLEGRA)

COMCATION, INC.

Plaintiff

V.

THE UNITED STATES,

Defendant

JOINT STIPULATION OF UNDISPUTED FACTS

Pursuant to the Court's order dated August 29, 2006, the parties hereby present the following Joint Stipulation of Undisputed Facts:

1. Definitions. For the purpose of this stipulation, the parties have set forth the following terms, and definitions for those terms, that are used in the stipulation. The definitions are meant to be informative, but not limiting:

a. "*Internet*" shall mean the distributed, interoperable, packet-switched network that links computers worldwide for the exchange of data and information.

b. "*Internet access service*" shall mean a service offered by an Internet Service Provider ("ISP") that permits customers to access the Internet, along with other

secondary functions, such as electronic mail services, web hosting, and other value-added services.

c. *"Internet Service Provider"* or *"ISP"* shall mean a vendor who provides its customers with Internet access service.

d. *"Internet Backbone"* shall mean the very large bandwidth (typically fiber optic) networks owned by a small number of providers, which interconnect at Network Access Points located in major metropolitan areas worldwide.

e. *"Central Office"* shall mean the facility where telephone companies terminate lines and locate switching equipment to interconnect those lines with other networks. The local loop, which are the lines that physically connect homes and businesses to the public telephone system are terminated in the Central Office (CO). A CO is a major equipment center designed to serve the communications traffic of a specific geographic area. Central Offices are generally owned by an ILEC or a CLEC in larger markets. The Central Office is a facility that an ISP will interconnect with in order to obtain the services provided by a telecommunications provider.

f. *"National Access Point"* (NAP) is used by many ISPs to describe the interconnection points or gateways where the T-3 lines that form the Internet Backbone are linked and where local ISP's must connect in order to carry their customer's data traffic to the Internet Backbone.

g. *"Dial-up Access"* is the process by which a computer remotely located, e.g. in a person's home or place of business, initiates a network connection via its modem over a traditional telephone line. The "call" then terminates at a circuit leased by an ISP (ISP model) and is routed into the ISP's digitized packet network. Dial-up Access allows

an ISP to provide their customers with access to internet content along with electronic mail capability.

h. *"Direct Inward Dialing (DID) Service"* is a service provided by telecommunication providers that allows incoming calls from the public network to reach a specific station line in a Private Branch Exchange (PBX) or network without attendant assistance.

i. *"ISDN"* or *"Integrated Services Digital Network"* is a digital service provided by CLEC's and LEC's that is delivered over pairs of twisted copper wire and that allows for more efficient and higher capacity transmission of voice and data messages than traditional analog service, and which requires the user of the service to have ISDN terminal equipment to manage the digital information flow.

j. *"Primary Rate Interface" or "(PRI)"* is a an ISDN configuration (usually provided by the Local Exchange Carrier) that uses a T-1 circuit, and which allows the user to have access to 23 bearer channels for voice or data traffic and 1 signaling channel over two pairs of twisted copper wires at a total speed of 1.544 megabits per second. The PRI service allowed an ISP to provide Dial-up Access to the Internet in the same way it was provided on the Channelized T-1 service. In addition, if the ISP customer also had their own ISDN service in their home or business they could dial-up and have a completely digital and significantly faster connection to the Internet.

k. *"Point of Presence"* or *"(POP)"* is the physical access location interface between a local exchange carrier and an ISP's digitized packet network. The point at which the telephone company terminates a subscriber's local loop circuit and the internet routing begins. The Point of Presence for an ISP was the physical location where their

customers would connect in order to gain access to the Internet. This is generally where the Network Access Server is located. In the present case, the Plaintiff defines the POP as the point where the telecommunication provider aggregates customer ISP traffic at the telecommunication carrier's central office onto one of Comcation's dedicated PRIs. Those PRIs in turn terminate at Comcation's Network Access Servers.

l. *"Network Access Server"* or *"NAS"* is a service element that clients dial into in order to get access to a network. Also known as a Remote Access Server (RAS), this device usually has interfaces both to the backbone and to telecommunications (POTS or ISDN) and receives calls from hosts that want to access the backbone by dialup services. A NAS is located at an ISP's POP to give their customers Internet access. Network Access Servers can attach a "modem" to a telephone circuit and provide data access to the Internet.

2. The Plaintiff is Comcation, Inc., located at 875 North Easton Road, Suite 6, Doylestown, PA 18901.

3. The Defendant is the United States of America.

4. At all times relevant hereto, Comcation was engaged in the business of selling Internet access to the general public throughout the southeastern portion of Pennsylvania, including Philadelphia.

5. As an Internet Service Provider (ISP), Comcation provided its customers with the capability of sending and receiving data over the Internet. To connect its customers to the Internet, Comcation purchased the Primary Rate Interface (PRI) service lines at issue in this case from telecommunication carriers. These services were used by

Comcation to form a network over which Comcation routed its customers' traffic to and from the Internet.

6. In practice, Comcation's dial-up customers connect to the Internet by having their computer's modem dial Comcation's local telephone number.

7. To access Comcation's network, the customer's modem converts the computer's digital signal into an analog signal for transmission through the local loop to the local telephone company's Central Office that services Comcation's PRI service lines. The cost of this loop (and any associated taxes) is included in the service cost to the dial-up customer and paid by the dial-up customer.

8. Upon reaching the Central Office, the dial-up customer's signal is re-converted into a digital representation and then transmitted to Comcation's modems through the PRI service lines.

9. Once the dial-up user's signal reaches Comcation's modem, Comcation's modem answers the call. Comcation's Network Access Server, in conjunction with an authentication server, authorizes the dial-up user's username and password. While this is happening, the dial-up user hears "screeching" sound from Comcation's modem. If the dial-up user's username and password are valid, then the dial-up user gets access to Comcation's network and is routed to the Internet; if the dial-up user's username and password are not valid, then the call is dropped.

10. The PRI service lines at issue in the present matter are of telephonic quality.

11. The PRI service lines at issue in the present matter allow anyone in the local telephone system to initiate a call to Comcation's Network Access Server.

12. The channels provided through a PRI service may be configured to be incoming, outgoing, or two-way, or may be configured on a call-by-call basis. Calls cannot be initiated on an incoming channel. However, once a call is established on an incoming channel, the communication is two-way, allowing a dial-up user to both send and receive information through the ISP's network.

13. During the period between October 1, 1998, and February 2, 2002, Comcation purchased services from the following vendors in order to construct its network to transport its customers' data traffic to and from the Internet:

Bell Altantic, Verizon, XO Communications, AT&T and TCG.

14. The following 11 Bell Atlantic accounts are at issue in this claim for refund: 215 258-6399-336; 215 340-4965-058; 215 489-1190-710; 215 504-9773-488; 215 661-8997-333; 215 856-9943-911; 215 946-4944-073; 215-956-0911-208; 215 193-6448-190; 215 489-3114-769; 215 489-5592-802. Bell Atlantic merged into Verizon during the period of this controversy.

15. The Verizon account at issue in this claim for refund is 215 230-8690-994.

16. The XO Communications account at issue in this claim for refund is 1000000020183.

17. The AT&T account at issue in this claim for refund is CCAT-CCAPA01.

18. The TCG account at issue in this claim for refund is CCAT-CCAPA01.

Respectfully submitted,

September 6, 2006___
Date

s/Anthony Gulotta________
Anthony C. Gulotta, Esquire
PA Atty. ID #82081
Anderson & Gulotta, P.C.
1110 North Mountain Road
Harrisburg, PA 17112
(717) 635-7145
Fax (717) 541-5434
tgulotta@fbstax.com

Attorney for Plaintiff

s/Jacob Christensen____________
JACOB CHRISTENSEN
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-0878

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
G. ROBSON STEWART
Reviewing Attorney

September 6, 2006____
Date

s/G. Robson Stewart___________
Of Counsel

Attorneys for Defendant