**ELECTRONICALLY FILED ON 11/13/2006**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 05-515 T
(JUDGE ALLEGRA)

COMCATION, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

---

POST TRIAL BRIEF
(MEMORANDUM OF CONTENTIONS OF FACT AND LAW)

---

The Plaintiff, Comcation, Inc., (hereinafter 'Plaintiff' or "Comcation"), through their Attorney Anthony C. Gulotta, in response to the Court's Order Requesting a Post Trial Brief dated September 28, 2006, submits this Post Trial Brief in the present matter. The arguments set forth in Comcation's pre-trial brief are incorporated by reference herein.

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES.......................................................................v

ISSUES.....................................................................................1

PROPOSED FINDING OF FACTS.................................................................1

BURDEN OF PROOF..........................................................................12

SUMMARY OF ARGUMENT......................................................................13

DISCUSSION................................................................................15

I. The Plaintiff's purchase of dial up access, consisting of PRI lines, are outside the scope of the definition of "local telephone service" found in 26 U.S.C. §4252 and, therefore, are not subject to the federal excise tax on communications found in 26 U.S.C. §4251?...........15

A. Comcation Has Met Their Burden of Proof At The Trial.............17

1. One or more of the PRI Lines Purchased by Comcation Were Provisioned as Inward Dial Only........19

a. Industry Standard - PRI Purchased by an Internet Service Provider Is Provisioned for Inward Dial Only.......................................19

b. The lines purchased from Bell Atlantic were Enhanced IntelliLinQ PRI Hub Service, provisioned for inward dial only.....................20

c. The lines purchased from TCG/AT&T were provisioned for inward dial only.....................22

2. The Majority of the PRI Lines Purchased by Comcation provided access to a local exchange outside of the local exchange that Comcation's network access servers were located in........................23

B. Inward dial lines do not give Comcation the privilege of access necessary to bring the lines within the definition of "local telephone service" contained in IRC Section 4252..................................................24

C. PRI lines that do not give Comcation access to the local telephone system where their telephone (network access server) is located do not meet the definition of "local telephone service" contained in IRC Section 4252..................................................25

D. To the extent that there is any doubt as to whether or not Comcation's purchases are included in the scope of "local telephone service" that doubt must be resolved in the favor of the Taxpayer..............................27

1. Internet Tax Freedom Act.....................................29

2. The IRS's proposed rule making makes it clear that the IRS is struggling with the taxability of emerging technologies........................................30

3. The IRS's recent Notice 2006-50 places serious doubt as to the taxability of any service where the

person's telephone (network access server) is outside the local telephone system of the person that they are communicating with..........................32

4. Legislative History..........................................33

5. Congressional Initiatives....................................33

II. The Plaintiff's purchase of PRI lines are not subject to the federal excise tax found in 26 U.S.C. §4252(a)(1), since they are private communications, therefore excluded from the definition of local telephone service..........................................36

A. The PRI purchased by Comcation gave them the exclusive or priority use of the channels.................................36

B. The PRI purchased connected a local calling area switch to another local calling area switch, again making them "private communications".............................................38

CONCLUSION.....................................................................40

EXHIBITS

Internal Revenue Code Sections 4251 and 4252..............................Exhibit A

April 27, 2004 Notice of Disallowance ........................................Exhibit B

I.R.B. 06-25 (June 19, 2006)..........................................................Exhibit C

H. 786, Tax-Free Internet Act of 1997 (comments of Congressman Weldon).....Exhibit D

I.R.B. 04-29 (July 19, 2004)..........................................................Exhibit E

*Options to Improve Tax Compliance and Reform Tax Expenditures*, Joint Committee of Taxation, U.S. Congress January 27, 2005............Exhibit F

TABLE OF AUTHORITIES

**STATUTES**

26 U.S.C. §4251 ....................................................1, 14, 15, 16, 31, 32

26 U.S.C. §4252 ....................................1, 13, 14, 15, 24, 25, 30, 32, 33, 34, 37

26 U.S.C §4252(a) ....................................................1, 17, 26

26 U.S.C. §4252(a)(1) ....................................................15, 16, 24, 25, 33, 36

26 U.S.C. §4252(a)(2) ....................................................36

26 U.S.C. §4252(b) ....................................................26

26 U.S.C. §4252(b)(2) ....................................................26

26 U.S.C §4252(d) ....................................................1, 36, 37

26 U.S.C. §4252(d)(2) ....................................................37

26 U.S.C. §4252(d)(3) ....................................................39

26 U.S.C. §7805 ....................................................28

47 USC §151 ....................................................29, 30, 34

**CASES**

Comdata Network, Inc. v. U.S., 21 Cl. Ct. 128 (1990) ..............................15, 24, 25

David Cook v. United States, 46 Fed Cl. 110 (Fed. Cl. 2000) ..........................12, 17

Fortis, Inc. v. United States, 2004 WL 2085528 (S.D.N.Y. 2004) ..........................35

Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683 (1983)..................18

Lewis v. Reynolds, 284 U.S. 281 (1976) ..............................................12

Metropolitan Stevedore Company v. John Rambo, et al., 521 U.S. 121 (1995)............18

National Railroad Passenger v. United States, 338 F.Supp.2d 22 (D.C. 2004)............26

Office Max, Inc. v. United States, 309 F.Supp. 2d 984 (N.D.OH 2004) ..........16, 37, 38

Trans-Lux Corp. v. United States, 696 F.2d 963 (Fed. Cir. 1982)....................12

United States v. Max Janis, 428 U.S. 433 (1976)....................12

Western Electric Company, Inc. v. United States, 564 F.2d 53 (Ct.Cl.1977)....................28, 33, 35, 37

**MISCELLANEOUS**

Excise Tax Reduction Act of 1965, Pub. L. No. 89-44, 79 Stat. 146....................28, 30, 37

Excise Tax Technical Changes Act of 1958, Pub.L. No. 85-859, 72 Stat. 1275....................37

H. 786, Tax-Free Internet Act of 1997 (comments of Congressman Weldon)....................29

H.R. 1898, Telephone Excise Tax Repeal Act of 2005....................34

H.R. Rep. No. 89-433, 1965 U.S.C.C.A.N. 1645....................33

I.R.B. 04-29 (July 19, 2004)....................30

I.R.B. 06-25 (June 19, 2006)....................32, 34

Merriam-Webster's Collegiate Dictionary Eleventh Edition (2003)....................38

*Options to Improve Tax Compliance and Reform Tax Expenditures*, Joint Committee of Taxation, January 27, 2005....................33, 34, 41

Priv. Ltr. Rul. 200133008 (August 17, 2001)....................11, 28

Rev. Rul 78-437 (1978)....................37

Rev. Rul. 79-245 (1979)....................15, 25

Rev. Rul. 79-405 (1979)....................15, 24

S. 758, Federal Internet Tax Prohibition Act of 2005....................33, 34

S. 1321, Telephone Excise Tax Repeal Act of 2005....................34

S. Rep. No. 109-336, Telephone Excise Tax Repeal and Taxpayer Protection Assistance Act of 2006....................34

Thomas. The Library of Congress. <http://thomas.loc.gov>....................34

## ISSUES

I. Whether the Plaintiff's purchase of dial up access, consisting of PRI lines, are outside the scope of the definition of "local telephone service" found in 26 U.S.C. §4252 and, therefore, not subject to the federal excise tax on communications found in 26 U.S.C. §4251?

II. Whether the Plaintiff's purchase of PRI lines are within the definition of "private communication service" found in §4252(d), therefore, excluded from the definition of "local telephone service" found in §4252(a)?

## PROPOSED FINDING OF FACTS

The present claim involves a request for refund of the Federal Communication Excise Tax, found in Internal Revenue Code Section 4251. Internal Revenue Code Section 4251 and 4252 are attached hereto as "Exhibit A" of this brief and are made a part hereof. The Plaintiff filed a request for refund, which included IRS Form 8849, supporting schedules, quarterly tax breakouts and "non-consent statements," on February 27, 2002 in the amount of $15,000.00. On June 25, 2002, the Plaintiff received notification acknowledging the receipt of the Plaintiff's claim submitted on February 27, 2002. On April 27, 2004, Plaintiff received a notice of disallowance of its refund claim from the IRS. A copy of the notice is attached hereto as "Exhibit B" of this brief and is made a part hereof. On May 17, 2004, Plaintiff filed a formal protest of the IRS's determination. No response was received from the IRS. On May 4, 2005, the Plaintiff filed a timely Complaint with the United States Court of Federal Claims.

Comcation, Inc. (Comcation) is an Internet Service Provider (ISP). Joint Stipulation (JS) ¶5. The company began in 1994. R. 25:21-22. An ISP is a vendor who provides its customers with Internet access service. JS ¶1(c). The specific type of access that Comcation provides is known as dial up access. JS ¶1(g), ¶¶5-9. Comcation's dial-up customers connect to the Internet by having their computer's modem dial Comcations's local telephone number. JS ¶6. The call travels over the customers' local loop to their local telephone company's Central Office. JS ¶1(c). The customer pays the Federal excise tax on this portion of the connection and it is not the subject matter of this litigation. JS ¶7; R. 37:23. The Central Office is a major equipment center that connects the lines that physically run to the homes and businesses in the public telephone system for a specific geographic area. JS ¶1(e). In the present case, when the customer's data call reached their local Central Office it was then routed to one of the Primary Rate Interface (PRI) lines purchased by Comcation. JS ¶5, 8; R. 37:18-23. These PRI lines are the subject matter of this litigation. Id.

Since an Internet customer dialing its ISP requires a local telephone number for its computer to dial to avoid long distance charges, Comcation purchased PRI lines in the markets that they wanted to target. R. 29:7-10; 30:3-5; R. 62:6-8; R. 72:8-22. In order to determine what would constitute local calling areas, Mr. Smith, the founder of Comcation, studied the different local exchanges and determined what the local numbers would be for the geographic areas of southeast Pennsylvania that he wanted to provide service. R. 29:20-24. The PRI was then purchased from phone companies providing service in the desired area (the example used at trial was the Quakertown POP). R. 30:19-21; R. 3:19-12; R. 97:7-13. Dr. Hills pointed out:

> "That's precisely the purpose they put them [PRI] in for. They put them in [PRI] so that they could get local telephone service across the whole region, so that if individual customers were supplied with a phone number that was local to them which is one of those POPS [referring to PX 1] , they could access through the local network, the PRI, for a local call." R. 97:7-13.

The customers were then given a list of phone numbers and they selected the dial up telephone number that was local for them. R. 28:11-20; R. 66:1-6. The internet traffic (calls) at the various Central Offices were then aggregated on the PRI purchased by Comcation and transported over the PRIs to Doylestown. R. 28:15-20, 31:9-12, 32:9-12;. The data calls were answered in Doylestown where Comcation's Network Access Servers are located. R. 32:2-21. Comcation does not have any equipment located at the POPs noted on their network diagram, other than the Doylestown's POP. R. 32:7-9; PX 1.

Once a call reaches Comcation's facilities in Doylestown, one of Comcation's Network Access Servers answer the call and the caller's computer is required to negotiate an authentication process. J.S. ¶9. If the dial-up caller's username and password are valid, then the caller's computer is given access to Comcation's network and is routed to the Internet; if the caller's username and password is not validated, the call is dropped. Id. The call is answered by the Network Access Server regardless of whether or not the person knows the correct authentication. R. 35: 8-10.

PRI is a digital service that uses a T-1 circuit. JS ¶¶1(i),(j). The service provides 23 channels, which can be used simultaneously for voice or data traffic. Id. In the present case each PRI allowed 23 customers to dial into Comcation's network at the same

time. R. 38: 4-11. PRI did not exist in 1965. R. 128:22-24. In fact in 1980 digital service, such as PRI, was still in its infancy. R. 129:1-2.

The PRI that is the subject matter of this litigation was purchased from various service providers. R. 35:21-23; R. 36: 13-22; R. 43:9-11. PX 2. Initially, Comcation purchased their PRI from Bell Atlantic, later known as Verizon, and TCG, later consolidated into AT&T. R. 43:9-10. Eventually, Comcation purchased all of its PRI from XO Communications. R. 43:11. PRI was chosen because it was the most economical way to provide dial-in service to Comcation's network. R. 38:4-11. Comcation eventually switched to XO Communications PRI service to obtain substantial savings. R. 45:1-2.

The Bell Atlantic PRI was used to connect customers in the following local calling areas to Comcation's network access servers located in Doylestown: Perkasie, Doylestown, Newton, North Wales, Philadelphia, Levittown and Hatboro. R. 49:18-21; R. 52:6-9. The Bell Atlantic PRI service is known as IntelliLinQ PRI. R. 102:19-23. There are two types of IntelliLinQ PRI: Basic and Enhanced PRI Hub service. Id. The second is specifically designed for ISPs. R. 103:1-5. When shown the definition of the Enhanced PRI Hub service contained in the Tariff, Mr. Smith stated that this was the service they had purchased from Bell Atlantic. R. 64:15-23; R. 65:2. In his expert report Dr. Hills also concluded that the service was Enhanced PRI Hub Service. DX1, pg 8-9, ¶¶ 8-9. Enhanced PRI Hub Service is described in the Tariff as:

> "Enhanced IntelliLinQ PRI Hub service is a Telephone Company-designed LATA-wide network service which allows ISRAPS [Information Services Remote Access Providers, also know as Internet Service

> Providers] to provide their end user customers with single-number dial-up access to the ISRAP's premises location. The service utilizes strategically located single-number-service hub offices to collect and route traffic using Advanced Intelligent Network features to predetermined points of interconnection, from where the traffic is routed to the ISRAP's premises location over dedicated facilities." Id. at Sheet 1A (explanation of ISRAPS added).

During direct examination Dr. Hills swayed from his expert report stating that the service may have been the basic PRI service. R. 103:10-13.

The Enhanced IntelliLinQ PRI Hub service was designed and offered to ISPs. R. 74:14-23. In Comcation's case the PRI connected two central offices and then directed the traffic to Comcation's office in Doylestown. R.44:2-9. One Central Office was the location of the "POP." Id. The other Central Office was Doylestown. Id. The service would, therefore, allow a customer to call the phone number of the virtual POP located in their local calling area. The call would then be aggregated onto Comcation's PRI and transported to Comcation's Doylestown office where the call would be answered by Comcation's Network Access Server. Id. The charge for the Bell Atlantic PRI was a fixed monthly cost that included a distance charge that varied based on the distance between the Doylestown Central Office and the Central Office at the POP location. R. 44:3-21. As such, the cost for this service was distance sensitive. Id. The total tax at issue in this matter for purchases from Bell Atlantic is $6,055.38.[1] PX 2.

---

[1] After the trial, but prior to this brief being due, the Government agreed that accounts 215 193-6448-190 and 215 489-3114-769 were not within the scope of the definition of "Local Telephone Service" and,

Comcation purchased "Primeconnect DID Multirate CTR and ISP PRI Arrangement" from TCG. PX 4, 568a. Comcation purchased this service because it allowed them to use one PRI to aggregate the traffic from four different POP locations, specifically Ardmore, Reading, Swarthmore and West Chester. R. 57:16-21; R. 112:4-6 (Dr. Hills stated that "multirate center refers to the fact…that one PRI…is used to support calls from four different rate centers."). The service had a number that anyone in the four calling areas could dial into locally to connect to Comcation's network access servers in Doylestown. R. 58:1-4; R. 112:4-6. A single PRI was then used to transport up to 23 calls simultaneously aggregated from the four local numbers. R. 58:1-4. The service was the same when AT&T acquired TCG. See PX4, 591a; R. 59:5-6. The Government's witness, in his expert report defines direct inward dial (DID) as a service "that allows incoming calls…." DX 1, pg 18. Mr. Smith also noted that this service was provisioned for incoming calls. R. 58:18-19. Although Dr. Hills noted it was unclear why DID would be used in this application, he did note that the invoice, by using the term "ISP/PRI" means that "it's a normal PRI that actually is configured to receive calls from multiple rate centers [different local calling areas]" R. 112:1-2; R. 112:15-18 (Dr. Hills noted that one explanation for using a DID line was that it would allow a single call in number that would then roll to the available trunks); R. 117: 13-16. As such, these lines connected the customers in local calling areas in Ardmore, Reading, Swarthmore and West Chester to Comcation's Network Access Service in Doylestown. When a customer's computer dialed the numbers offered by TCG and AT&T the call was

---

therefore, the Government informed the Plaintiff that they are conceding this portion of the refund request, in the amount of $176.26. These accounts are, therefore, not included in the total of the purchases from Bell Atlantic.

answered in Doylestown. The total amount of communication excise tax paid on these lines was $1,726.62. PX 2.

XO Communications provided PRI in Doylestown, Quakertown, Hatboro, Philadelphia, West Chester, Ardmore, Swarthmore, Newtown, Reading, N. Whales and Levittown. PX 6. Comcation switched to the service provided by XO because it was substantially cheaper than the PRI service from the other providers. R. 61:11-13. All of the XO PRI were priced the same, $500 per month. PX6. The price was not affected by the distance of the lines. R. 61:23. The total amount of communication excise tax paid on these lines was $2,379.16.

A review of the invoices for all the PRI, regardless of the provider, noted no outgoing call detail. R. 50:9-17; R. 59:7-14. This is consistent with the fact that Mr. Smith requested they be provisioned for inward bound calls only and with the fact that the lines were used for incoming calls only. R. 73:20-23; R. 50:16; R. 45:21-24.

If a line is provisioned for inward dial only, an outgoing call cannot be initiated on the line. J.S. ¶12; R. 130:1-8; R. 149:2-8. An ISP only requires inward dial lines, since they have no requirement for outward bound dialing. R. 45:12-14. Mr. Smith was the individual that signed up for Comcation's ISP services over the years. R. 40:22-24. When Comcation requested the services noted above, the sales representatives from the various phone companies were aware that Comcation was an Internet Service Provider. R. 43:1-6. When he acquired the service he requested that inward dial only lines be provided. R. 45:21-24. Although neither Mr. Smith or Dr. Hills had personal knowledge as to how the PRI lines were actually provisioned, Dr. Hills conceded that in the year 2000 it was "probable they were" provisioned for incoming calls only. R. 45:21-24; R.

120:13-14. This was consistent with his expert report that stated "it is worth noting that from the point of view of the ISP the lines are generally configured to be what is called 'incoming only'". DX1, page 4-5, ¶19. "What this means is that calls are originated from the Central Office." Id. In addition to the testimony the invoices clearly showed that the TCG and AT&T invoices were for incoming calls only. PX4, pg. 568a; R. 117: 14-16. Dr. Hills noted that "what it means by ISP/PRI is the fact that it's a normal PRI that actually is configured to receive calls from multiple rate centers." R. 117: 14-16. He went on to state that "this was a service that was used for incoming calls only." R. 118:3-4.

All the PRI lines at issue in the present matter were answered in Doylestown. R. 28:11-20; R. 32:22-25. No equipment was located at the POPs depicted on PX1. R. 28:19-20; R. 30:25, 31:1-2. All of Comcations' network access servers, the piece of equipment that answers the data calls received on the PRI lines that are the subject matter of this litigation, are located in Doylestown. R. 31:1-2. Using Quakertown as an example, while explaining how a customer's computer connects to the network access servers, Mr. Smith testified that:

> "When it dials the Quakertown phone number, you would connect to a central office in Quakertown and that central office would interconnect to the Doylestown central office which then connects to our network access servers which are located in Doylestown." R. 28:15-20.

His description of the Bell Atlantic service was indicative of this "local access" at POPs in calling areas outside Doylestown. R. 44: 2-9. As Mr. Smith explained:

> "Except for Doylestown which was local to our network access servers, it involved two central offices and one central office would be at the rural location which was the name of the POP and the other central office would be Doylestown. They would charge a fixed cost for each end and then there was a distance charge related to the distance between the remote central office and the Doylestown central office." R. 44:2-9.

Dr. Hills' explanation of how the lines were used was similar:

> "So they [the dial up Internet customer] established a local call between their local exchange and the local exchange in the Quakertown POP [using Quakertown for his explanation]. Those 23 channels are then assembled into a PRI and those 23 channels, the PRI service, is then connected to the network access by some type of private line service." R. 98:7-13.

The PRI lines themselves were "open circuits," "a circuit that's always complete," which means they were being used by Comcation 24hours a day. R. 80:12-16. (Mr. Smith redirect); R. 142:14-19 (Dr. Hills Cross). The PRI circuit does not get initiated and closed on a call by call basis. R. 80:12-16.

Dr. Hills explained that Comcation's "modem in Doylestown is connected to the central office in Reading." R. 127:20-21. He went on to say that it is in effect "a local call within Reading." R. 127:23. In fact, but for the PRI lines, if Comcation had initiated (assuming they were using a regular line) a call from Doylestown to any one of the POP locations, and vice versa, it would have been a long distance call. R. 128:1-17; R. 121:11-12; R. 62:6-8. In fact, the Reading POP was located in a different LATA. R.

62:14-19. That is the reason the PRI was purchased. Id. As such, the PRI lines provided a channel for customer Internet traffic to be aggregated in one local calling area, where the POP was located, and transported across local calling areas to Doylestown. In Doylestown the phone call was answered by Comcation's network access server. So the PRI lines that connected Comcation's network access servers in Doylestown to the POPs in other cities, did not provide Comcation access to the Doylestown local telephone system. See R. 121:14-18. Instead, it was Dr. Hills testimony that when Comcation purchased PRI for a POP location, such as Ardmore, they were getting local access to that local exchange, Ardmore's not Doylestown's. R. 123:14-15. It was also clear, based on Dr. Hills' testimony, that this was not a toll or long distance call, but rather access to the local calling area of a local exchange outside the local calling area in Doylestown. R. 122:10-23. He characterized the capability as a "out-of-area telephone line or an exchange line." R. 133:21-24.

Dr. Hills testified that the PRI was a flat rate, "based on the distance." R. 137:17-19. This was consistent with Mr. Smith's testimony that he paid a fixed monthly rate for the PRI lines, depending on the distance the PRI was from the POP location to Doylestown. R. 44:1-21. Dr. Hills also indicated that the PRI lines purchased would have a per call charge for outgoing calls, if outgoing calls could in fact be made. R. 140:9-15; 142:9-13. Dr. Hills also noted that the lines that ran from one local calling area to the other, the PRI lines that originated outside of Doylestown were "private line(s)." R. 143:2. He also referred to this connection outside of the local calling area to Doylestown as "a private pair of wires to some other location." R. 144: 24. In another

explanation during direct examination Dr. Hills stated "the PRI service, is then connected to the network access [server] by some type of private line service." R. 98:9-12.

The PRI lines that are the subject matter of this litigation provide telephonic quality communications. J.S. ¶10. Once a call is established on the PRI lines, two way communications can occur. J.S. ¶12. However, the lines in question are digital, while regular phone service is analog. R. 47:16-18. As such, PRI can not be used for regular phone service without specialized customer premises equipment. R. 48:6-9. Finally, Dr. Hills testified that the PRI service discussed in Private Letter Ruling 2001-33008 was the same type of PRI service that is the subject matter of this litigation. R. 131:14.

## BURDEN OF PROOF

"In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover." United States v. Max Janis, 428 U.S. 433, 440 (1976) (applying the rule to a request for refund of Federal Wagering Excise Tax) (citing Lewis v. Reynolds, 284 U.S. 281 (1932); See also David Cook v. United States, 46 Fed Cl. 110, 115-116 (Fed. Cl. 2000) (concluding the taxpayer bears the burden of proving that they are entitled to a refund of tax) (citing United States v. Real Estate Sav. Bank, 104 U.S. 728, 732-34 (1881)). "The action to recover on a claim for refund is in the nature of an action for money had and received and it is incumbent upon the claimant to show that the United States has money which belongs to him." Lewis v. Reynolds, 284 U.S. 281, 283 (1976). The Taxpayer has met their burden of proof, if a preponderance of the evidence persuades the court that they are entitled to a refund. See Cook v. U.S., at 116.

Although the Taxpayer bears the burden of producing evidence that persuades the Court that they are entitled to a refund, any question of law concerning an ambiguous section of the taxing code must be resolved in favor of the Taxpayer. Trans-Lux Corp. v. United States, 696 F.2d 963, 968 (Fed. Cir. 1982). Specifically, "If [such an interpretation] leads to a conclusion that there must be doubt as to taxability, then it should be resolved in favor of the taxpayer." Id.

## SUMMARY OF ARGUMENT

The fundamental issue presented to the Court in this matter is whether or not purchases made by Comcation were within the scope of the definition of "local telephone service" found in 26 U.S.C §4252. Since the definition of "local telephone service" also specifically excludes "private communication service," a secondary question is, even if the services purchased by Comcation fit within the definition of "local telephone service," are they otherwise excluded from that definition as "private communication service."

Comcation asserts that the inward dial lines they purchased to provide Internet access to their customers do not allow them to initiate outgoing calls and, therefore, are not within the definition of "local telephone service," since Comcation did not have the privilege to access the phone system on their own accord. Furthermore, it was clear that the majority of lines in question did not give Comcation access to the local calling area in Doylestown, where their Network Access Servers were located, but rather gave them access to exchanges outside of their local calling area. As such, regardless of whether they are incoming only lines, these PRIs are not within the scope of "local telephone service."

In addition to the application of the facts in this matter to the plain meaning of the statutory definition of "local telephone service," there are also several factors that cast serious doubt as to the taxability of the PRI lines purchased by Comcation. The factors include: the prohibition against the further Federal taxation of lines purchased by ISPs to provide Internet access (the very

lines we are discussing today); the IRS's acknowledgment in proposed rulemaking that the application of Section 4252 to technologies that were developed after the law was enacted in 1965 is in question (PRI line technology was developed in the 1980s); the legislative history of Section 4252 and; the wording of proposed Congressional legislation, along with Congressional testimony. All of these considerations, along with questions concerning the plain meaning of the definition of "local telephone service" cast serious doubt as to the taxability of the PRI lines purchased by Comcation. As a matter of law, that doubt must be interpreted in favor of Comcation.

Regardless, if the Court finds that the lines in question meet the definition of "local telephone service" they are otherwise excluded as "private communication service." It was clear based on the testimony at trial that the lines in question were open circuits, which were always complete, and were described numerous times by the Government's expert as "private lines".

The remaining taxable services of 26 U.S.C. §4251, "toll telephone service" and "teletypewriter exchange service" are not applicable in the present matter. Furthermore, due to the multiple holdings in favor of Taxpayers dealing with "toll telephone service," the IRS recently issued Notice 2006-50, Dated May 26, 2006. This notice, in effect rescinds the tax on "toll telephone service" and "local telephone service" to the extent that the local service is bundled with the long distance service. Notice 2006-50, May 26, 2006. A copy of this notice is included in this brief as "Exhibit C."

Finally, based on a careful review of the evidence and legal precedence, Comcation is dropping their Doctrine of Equality of Treatment argument.

## DISCUSSION

I. The Plaintiff's purchase of dial up access, consisting of PRI lines, are outside the scope of the definition of "local telephone service" found in 26 U.S.C. §4252 and, therefore, are not subject to the federal excise tax on communications found in 26 U.S.C. §4251?

26 U.S.C. §4251 imposes a tax "on amounts paid for communications services," including "local telephone service."

26 U.S.C. §4252(a)(1) defines "local telephone service" as:

> "the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system."

Comcation's Pre-Trial Brief, dated June 28, 2006, takes the Court through the application of Section 4252 to various fact patterns by Court's and the Internal Revenue Service. Comcation's Pre-Trial Brief is incorporated herein by reference. Two principles emerge from the line of cases and Revenue Rulings: 1. The capability of the line, not its actual use, must determine its taxability[2] and; 2. When applying the IRC we must look at the

[2] Comdata Network, Inc. v. U.S., 21 Cl. Ct. 128 (1990); Rev. Rul. 79-245 (1979); Rev. Rul. 79-405 (1979).

plain meaning of the statutory language[3]. The Plaintiff agrees with these principles. When applied in the present matter these principles lead to only one conclusion of law, the PRI lines purchased by Comcation are not subject to the Federal communication excise tax imposed under Section 4251.

Applying the first principle, based on a close reading of prior rulings, the question then is not whether the technology –PRI lines- can be used to provide "local telephone service," but rather whether the services offered to Comcation by each individual carrier that employed PRI were provisioned in a fashion that gave them the right to utilize the lines to communicate with substantially all having local service in their local calling area. The Petitioner asserts that this requires the line to allow outgoing calls to telephones in their local calling area.

Applying the second principle in their Pre-Trial Brief[4], Comcation set forth the plain meaning of the words contained in the definition of "local telephone service" contained in Section 4252(a)(1) and emerged with the following reasonable plain meaning interpretation:

> Congress intended a service to come within the definition of "local telephone service" only if the consumer buying the service was entitled to (had the right and privilege to) access (make outgoing calls) the local telephone system and call (initiate and receive calls) with substantially all individuals in the local telephone system.

[3] "In all cases of statutory construction, the starting point is the language employed by Congress." Office Max, Inc., at 992 (citing Chapman v. The Higbee Company, 319 F.3d 825, 829 (6th Cir. 2003). "In other words, courts engaged in statutory interpretation must 'look first to the plain language of the statute.'" Office Max, Inc., at 992 (citing The Limited, Inc. v. Commissioner of Internal Revenue, 286 F.3d 324, 332 (6th Cir. 2002). "Where 'the statute's language is plain, the sole function of the court is to enforce it according to its terms." Office Max, Inc., at 992 (citing United States v. Mills, 140 F.3d 630, 633 (6th Cir 1999)).

[4] See pages 10-13 of Comcation's Pre-Trial Brief dated June 28, 2006.

The other observation concerning the plain meaning of this section that has emerged as determinative in the present matter is the definitions requirement that local access be with those individuals that are in the same local calling area. A close look at the language of the section highlights Comcation's assertion.

> "the access to **a local telephone system**, and the privilege of telephonic quality communication with **substantially all persons having telephone** or radio telephone stations **constituting a part of such local telephone system.**" 26 U.S.C. §4252(a).

As fully discussed below, it is Comcation's assertion that the plain meaning of this section, the definition of "local telephone service," requires that the customer have access in their local telephone system, not a local telephone system outside of the one that their "phone" (in this case network access servers) is located.

Prior to applying these two principles in the present matter we must first ask the Court to make two factual determinations. First, is one or more of the lines in question provisioned by the telecommunication provider supplying the lines as inward dial only? Second, are the PRI lines in question providing access to a local calling area outside of the local exchange that Comcation is located in?

### A. Comcation Has Met Their Burden of Proof At The Trial

In an action for a refund the Taxpayer has the burden of proof concerning the facts that support their claim. See Cook v. U.S., at 116. That burden of proof is met as to a fact, if a preponderance of the evidence persuades the court that the fact is so. Id. "The

burden of showing something by a preponderance of the evidence ... simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." Metropolitan Stevedore Company v. John Rambo, et al., 521 U.S. 121, 137 (citing Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal., 508 U.S. 602, 622, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993) (internal quotation marks omitted)). "In other words, the preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found, but does not determine what facts must be proven as a substantive part of a claim or defense." 521 U.S. at 137 (citing Greenwich Collieries v. Director, OWCP, 990 F.2d 730, 736 (C.A.3 1993) ("A preponderance of the evidence is ... [e]vidence which is ... more convincing than the evidence ... offered in opposition to it ..." (internal quotation marks omitted)), aff'd, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). "Unlike other standards of proof such as reasonable doubt or clear and convincing evidence, the preponderance standard "allows both parties to share the risk of error in roughly equal fashion," Herman & MacLean v. Huddleston, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983) (internal quotation marks omitted), except that "when the evidence is evenly balanced, the [party with the burden of persuasion] must lose," 521 U.S. at 137 (citing Director, Office of Workers' Compensation Programs v. Greenwich Collieries, 512 U.S. 267, 281, 114 S.Ct. 2251, 2259, 129 L.Ed.2d 221 (1994)).

**1. One or more of the PRI Lines Purchased by Comcation Were Provisioned as Inward Dial Only.**

Comcation purchased a number of services that could generally be grouped into the category of PRI. The specific services were purchased from three carriers: Bell Atlantic (subsequently Verizon), TCG (subsequently AT&T) and XO Communications. Each of these services had the potential of being provisioned by the carrier providing the services in a specific way at the time of the purchase. The testimony concerning standard industry practices, and the specific details about the Bell Atlantic and TCG services, indicate that it is more likely than not that the PRI were provisioned for inward dial only.

**a. Industry Standard - PRI Purchased by an Internet Service Provider Is Provisioned for Inward Dial Only**

An ISP only requires inward dial lines, since the entire purpose of the lines it to allow their customers to dial into their network access servers. Mr. Smith, the individual that signed Comcation up for all of its PRI over the years, testified that the sales representatives from the various phone companies were aware that Comcation was an Internet Service Provider at the time that they signed up for the PRI. When he acquired the PRI from each of the providers he requested that inward dial only lines be provided. Although neither Mr. Smith or Dr. Hills had personal knowledge as to how the PRI lines were actually provisioned, Dr. Hills conceded that in the year 2000 it was "probable they

were" provisioned for incoming calls only. This was consistent with his expert report that stated "it is worth noting that from the point of view of the ISP the lines are generally configured to be what is called 'incoming only'". He went on to say in his report that "what this means is that calls are originated from the Central Office."

Based on the expert testimony and report of Dr. Hills that it was an industry practice in the year 2000 to provision PRI lines purchased by ISPs for inbound dial only, Mr. Smith's testimony that the carriers were aware that he was an ISP and that he requested incoming calls only lines, it is more likely than not that all the lines in question were provisioned for inward dialing only. In fact, Dr. Hills testified it was "probable they were" provisioned for incoming calls only. This evidence taken alone is convincing and this Court should find that the existence of this fact, that the lines were provisioned for incoming calls only, is more probable than its nonexistence.

Even if the Court holds that the evidence is not convincing enough to find that all of the lines were provisioned for incoming only, the lines offered by Bell Atlantic and TCG should be found to be incoming call only lines.

**b. The lines purchased from Bell Atlantic were Enhanced IntelliLinQ PRI Hub Service, provisioned for inward dial only**

The Bell Atlantic PRI was used to connect customers to Comcation's network access servers located in Doylestown. The Bell Atlantic PRI service is known as IntelliLinQ PRI. There are two types of IntelliLinQ PRI: Basic and Enhanced PRI Hub

service. The second is specifically designed for ISPs. When shown the definition of the Enhanced PRI Hub service contained in the Tariff, Mr. Smith stated that this was the service they had purchased from Bell Atlantic. In his expert report, Dr. Hills also concluded that the service was Enhanced PRI Hub Service. Enhanced PRI Hub Service is described in the Tariff as:

> "Enhanced IntelliLinQ PRI Hub service is a Telephone Company-designed LATA-wide network service which allows ISRAPS [Information Services Remote Access Providers, also know as Internet Service Providers] **to provide their end user customers with single-number dial-up access to the ISRAP's premises location.** The service utilizes strategically located single-number-service hub offices to collect and route traffic using Advanced Intelligent Network features to predetermined points of interconnection, **from where the traffic is routed to the ISRAP's premises location over dedicated facilities.**"

During direct examination, Dr. Hills swayed from his expert report stating that the service, may have been the basic PRI service. In the case of the Enhanced IntelliLinQ PRI Hub service Comcation introduced evidence that this was the service provided to Comcation, including Mr. Smith's testimony, Dr. Hill's expert report and the fact that the service was offered to ISPs, Comcation was an ISP and Bell Atlantic was aware they were an ISP. This evidence, taken together, is more convincing that the evidence offered in its opposition, which was Dr. Hills' testimony at trial, after finding in his expert report that it was the PRI Hub service, that he had doubts. As such, it is reasonable for this

Court to find that the existence of this fact, that inward dial only PRI Hub service was purchased from Bell Atlantic, is more probable than its nonexistence.

**c. The lines purchased from TCG/AT&T were provisioned for inward dial only**

Comcation purchased "Primeconnect DID Multirate CTR and ISP PRI Arrangement" from TCG. Comcation purchased this service because it allowed them to use one PRI to aggregate the traffic from four different POP locations, specifically Ardmore, Reading, Swarthmore and West Chester. The service had a number that anyone in the four calling areas could dial into locally to connect to Comcation's network access servers in Doylestown. A single PRI was then used to transport up to 23 calls simultaneously aggregated from the four local numbers. The service was the same when AT&T acquired TCG. The Government's witness, in his expert report, defined direct inward dial (DID) as a service "that allows incoming calls…." Mr. Smith noted that this service was provisioned for incoming calls. Although Dr. Hills noted it was unclear why DID would be used in this application, he did note that the invoice, by using the term "ISP/PRI," means that "it's a normal PRI that actually is configured to receive calls from multiple rate centers [different local calling areas]". As such, these lines connected the customers in local calling areas in Ardmore, Reading, Swarthmore and West Chester to Comcation's Network Access Service in Doylestown. When a customer's computer dialed the numbers offered by TCG and AT&T, the call was answered in Doylestown. In addition to the testimony, the invoices clearly showed that the TCG and AT&T invoices

were for incoming calls only. Dr. Hills noted that "what it means by ISP/PRI is the fact that it's a normal PRI that actually is configured to receive calls from multiple rate centers." He went on to state that "this was a service that was used for incoming calls only." As such, it is reasonable for this Court to find that the existence of this fact, that the PRI lines purchased from TCG (and AT&T) were provisioned for incoming calls, is more probable than its nonexistence.

**2. The Majority of the PRI Lines Purchased by Comcation provided access to a local exchange outside of the local exchange that Comcation's network access servers were located in.**

All of Comcation's network access servers, the piece of equipment that answers the data calls received on the PRI lines that are the subject matter of this litigation, are located in Doylestown. Therefore, all of the PRI lines at issue in the present matter were answered in Doylestown. No equipment was located at the POPs depicted on PX1. Instead, the traffic was consolidated at the POPs by the telephone companies providing the PRI and then transported to Comcation's Doylestown location. Comcation selected the POPs because they were outside of their local calling area – long distance calls. By placing the POPs in the calling areas selected they were able to provide customers with a local number that they could use to dial into Comcation's network access servers. Without these lines, the customers would have been required to dial a long distance number. The testimony of Mr. Smith and Dr. Hills supported this conclusion. As such, it is

reasonable for this Court to find that the existence of this fact, that except for Doylestown, the PRI lines purchased by Comcation provided access to a local exchange outside of the local exchange that Comcation's network access servers were located in, is more probable than its nonexistence.

Once we get beyond the factual questions in the present matter we must examine whether given these facts the capability of these lines fit within the plain language of the definition of "local telephone service."

**B. Inward dial lines do not give Comcation the privilege of access necessary to bring the lines within the definition of "local telephone service" contained in IRC Section 4252.**

In Rev. Rul. 79-405 the Service was faced with a taxpayer that purchased some taxable and some nontaxable lines. Rev. Rul. 79-405. The lines that they found to be nontaxable were the ones that did not give the taxpayer the right to utilize the telephone lines.[5] Id. Although there were several scenarios in Rev. Rul. 79-405, our case is similar to the facts in Rev. Rul. 79-405 where the service was not within the definition of local

[5] The Court in Comdata noted the significance of this distinction. Comdata at 130-131. The Court noting the term "privilege" connotes right, stated the tax is applicable when a person has the "right to utilize the telephone lines to communicate with a substantial number of stations...." Id. (discussing the term privilege as it relates to toll telephone service, which is defined in the same section as local telephone service). The Court went on to say the taxpayer in Rev. Rul. 79-405 purchased a service that "offered no opportunity to access a switchboard through which other numbers on the local telephone service could be reached." Id. The system in Rev. Rul. 79-405, where the service was not within the definition of local telephone service, was "inherently incapable of being used more expansively." Id. "For the purposes of the communications tax, this difference is critical." Id. In both Comdata and Rev. Rul. 79-405 the application of §4252(a)(1) rested upon whether the business purchasing the service could call other parties in the local calling area, if they were to use the full capability of the service. See Comdata at 130-131; Rev. Rul 79-405.

telephone service. Specifically, the incoming only service did not offer an opportunity to access a switch through which other numbers on the local telephone service could be reached. If the Plaintiff picked up a phone attached to the service it purchased, they could not have dialed a number and communicated with anyone in the local telephone system.

If we look to the capabilities of the lines, therefore, we find that the service did not have all the capabilities necessary to meet the definition of "local telephone service" in §4252(a)(1). Specifically, the service's capabilities did not grant Comcation the privilege of initiating calls with substantially all persons having a telephone in the local system. As such, the Plaintiff asserts that the lines at issue do not have the capabilities that were available to the taxpayers in Comdata or Rev. Rul. 79-245, nor do these lines rise to the level necessary to fall within the scope of local telephone service taxable under Section 4252.

**C. PRI lines that do not give Comcation access to the local telephone system where their telephone (network access server) is located do not meet the definition of "local telephone service" contained in IRC Section 4252.**

Even if the Court finds that the restrictions on the lines in question do not preclude Comcation from having the access and privilege necessary to bring it within the definition of "local telephone service," the PRI do not give access to

the same local telephone system that Comcation's phones (network access servers) are in. Again the definition provides:

> "the access to **a local telephone system**, and the privilege of telephonic quality communication with **substantially all persons having telephone** or radio telephone stations **constituting a part of such local telephone system.**" 26 U.S.C. §4252(a)

In National Railroad Passenger the Court was faced with the application of this code section. See National Railroad Passenger v. United States, 338 F.Supp.2d 22 (C.C. D.C. 2004) (emphasis added); affirmed 431 F.3d 374 (D.C. Cir. 2005). The Government argued that if the lines in question were not "toll telephone service", they were alternatively "local telephone service," since they gave the Taxpayer access to local telephone systems. The Court found:

> "It is inconceivable that Congress considered a nationwide telecommunications network to be "local." The test of the statute belies such an interpretation. Section 4252(a) explicitly provides that "local telephone service" does not include any service that is "toll telephone service." To define "local" as encompassing, the United States would cause §4252(a) to overlap with §4252(b), **particularly since §4252(b)(2) involves telephonic communications "outside the local telephone system area in which the station provided with the service is located."** National Railroad Passenger, 338 F.Supp.2d at 30.

PRI lines that aggregated dial up traffic and transported the traffic back to Comcation's network access servers, located in a different local calling area, did not give

Comcation access to a local telephone system in the same local telephone system in which they were located.

The Code requires that the caller have access to the same local calling area. In the present case Comcation has purchased a service that allows a customer to make a local call and then have that Internet traffic transported to Doylestown, a location outside their local calling area. Regardless of the explanations provided by Dr. Hills, any reasonable person would conclude the call geographically is terminated in Doylestown. This is the only place that Comcation had/has network access servers answering the calls.

The TCG lines add an additional dimension. In their case, multiple locations are consolidated onto a single PRI and transported over that PRI to Doylestown. Under Dr. Hills analysis this line would give us simultaneous access to four local calling areas. This is not consistent with the language of the Code, which specifically uses the term "such local calling area". The code language is singular, not plural. Congress did not anticipate this type of service would be considered local calling or they would have made the language broader.

Since the lines that Comcation purchased which provided access to telephone system outside their local calling area, were not within the definition of "local telephone service" Comcation is entitled to a refund of $7,336.67, regardless of the outcome of the other issues before the Court.

**D. To the extent that there is any doubt as to whether or not Comcation's purchases are included in the scope of "local telephone service" that doubt must be resolved in the favor of the Taxpayer.**

The Court in Western Electric Company found reasonable doubt as to the taxability of associated services billed separately from a Centrex system. The Court noted

> "here, there is such doubt as to taxability, because the applicable statute contains no definition of the phrase "necessary or unique," and there is virtually no legislative history explaining what Congress intended by it. The doubt is intensified by the fact that although some 12 years have elapsed since the passage of the Excise Tax Reduction Act of 1965, the Secretary has issued no clarifying regulation as authorizes by 26 U.S.C. § 7805. This is not a case where the failure to issue a regulation can be attributed to the fact that the meaning of the statute is so clear that there is no necessity for a regulation. The conflicting revenue rulings, to which we have referred, are strong evidence of doubt and confusion by the I.R.S. as to the correct interpretation of the statute.[6]" Western Electric Company, Inc. v. United States, 564 F.2d 53, 66 (Ct.Cl. 1977)

Our case, dealing with the same tax, is similar and in some ways leaves the Court with more doubt than was in Western Electric. A careful review of the regulatory and legislative landscape present in this area makes it clear that there are serious doubts as to the taxability of PRI lines used by ISPs to provide Internet access, that are inward dial only or alternatively provide access to a local exchange other than the exchange where Comcation is located.

[6] Although Comcation has dropped their argument concerning the Doctrine of Equality of Treatment, the fact that the IRS found in favor of the taxpayer in Letter Ruling 2001-33008, clearly demonstrates that even the IRS is unclear on how to apply the "local telephone service" definition when faced with PRI lines purchased by an ISP. That ruling was published in the year 2001 and at that time the IRS had the benefit of all the Revenue Rulings and cases that they would have this Court rely on today to reach an alternative decision. Although in no way cited as precedence, this Letter Ruling does support the Taxpayer's position that there is reasonable doubt that these lines should be subject to the communication excise tax. Letter ruling 2001-33008 was revoked without explanation in 2002.

**1. Internet Tax Freedom Act**

With the expanding availability of Internet access in the 1990's Congress recognized the potential impact of subjecting the Internet to taxation. See H786 (House of Representatives, March 06, 1997, comments of Congressman Weldon – attached hereto as Exhibit D). Congressman Weldon clearly noted as he introduced the Tax-Free Internet Act of 1997 that although online services were not presently subject to Federal taxation, he wanted to prevent future attempts to impose a Federal tax. Although that legislation did not pass, the Internet Tax Freedom Act passed the following year contained a specific prohibition against future Federal taxation of the Internet. 47 USC §151, note (Moratorium on Internet Taxes, restating the law in its entirety, with the prohibition against Federal Tax in Section 1201). The Act was recently extended through 2007. 47 U.S.C. §151, note (amendment known as the Internet Tax Nondiscrimination Act). The prohibition against Federal tax specifically states:

> "It is the sense of Congress that no new Federal taxes similar to the taxes described in section 1101(a) should be enacted with respect to the Internet and Internet access during the moratorium provided in such section." Id. at note §1201.

The taxes described in section 1101(a) include: "(1) Taxes on Internet access," with "Internet access" defined under the Act as:

> "The term "Internet access" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may

also include access to propriety content, information, and other services as part of a package of services offered to users. The term 'Internet access' does not include telecommunications services, **except to the extent such services are purchased, used, or sold by a provider of Internet access to provide Internet access.**" 47 U.S.C. §151, note at §1104(5)[7] (emphasis added).

It is clear that Congress intended that Internet access not be subject to new Federal taxation. It is also clear, since Internet access was not subject to the Federal excise tax at the time that the Act was originally imposed, and **Congress included telecommunication lines within the scope of the definition of Internet access, the lines at issue in this case should not be subject to Federal tax.**

**2. The IRS's proposed rule making makes it clear that the IRS is struggling with the taxability of emerging technologies.**

In 2004 the Internal Revenue Service provided advance notice on proposed rulemaking concerning the communication services excise tax. Internal Revenue Bulletin: 2004-29, July 19, 2004 (attached hereto as Exhibit E). This was 39 years after the passage of the Excise Tax Reduction Act of 1965. To date, even after this proposed rule making, no new regulations have been introduced since the passage of the 1965 Act. See 26 CFR 49.4252-1 to 4252-7 (among other obviously outdated provisions, discussing "general telephone service," which was eliminated in 1965 and replaced in IRC Section 4252 with "local telephone service" the service that is presently before the Court). The

[7] The definition was clarified in the amendment to include within the definition telecommunication lines purchased by an ISP and used to provide Internet access. The PRI lines at issue here today fit within this category specifically addressed by Congress.

IRS notes in the proposed rule making that "since 1965, numerous communications services have been developed and marketed, the methods of transmission have expanded, and the industry has been deregulated." Id. Furthermore, they noted that the "existing Treasury regulations do not reflect the 1965 statutory change." Id. Clearly, they do not, therefore, recognize technologies such as digital PRI lines (dial up access) and Internet access. See Id. The IRS also acknowledge "as a result of these changes, questions have arisen concerning the application of section 4251 to certain communications services that were not available in 1965." Id. As a result the IRS notes that Treasury and the IRS were "considering proposing regulations that would revise the existing regulations to reflect changes in technology.[8]" Id. Furthermore, in an effort to clarify and reflect the state of the new technology in the appropriate regulations they requested "suggestions describing the various technologies, services, and methods of transmission currently available for transmitting data and voice communications and how they should be treated under section 4251." Id. It is clear, based on this notice of proposed rulemaking, that the IRS's regulations do not include any new technologies that were developed since 1965, such as digital PRI lines (dial up access) and Internet access. Perhaps more revealing is the clear indication by the IRS that these technologies are not included in the present scope of Section 4251 and their intention to try to clarify the Regulations to bring some of the technologies within the scope of the tax.

---

[8] Interestingly, the Joint Committee on Taxation expressed "significant doubt, however, whether the IRS and Treasury have the statutory authority to resolve many of the issues currently arising under those rules." "Options to Improve Tax Compliance and Reform Tax Expenditures," January 27, 2005, pages 368-378 (Joint Committee on Taxation) at 377, f.n. 843.

**3. The IRS's recent Notice 2006-50 places serious doubt as to the taxability of any service where the person's telephone (network access server) is outside the local telephone system of the person that they are communicating with.**

The Internal Revenue Service recently announced, based on a string of holdings in Federal Courts across the Nation, that "long distance service" is no longer subject to the excise tax imposed under §4251. Internal Revenue Bulletin: 2006-25, dated June 19, 2006, §3 (defining **nontaxable** services as including bundled service and **long distance service**) (attached hereto as Exhibit C). The bulletin defines "long distance service" as "telephonic quality communication with persons **whose telephones are outside the local telephone system of the caller**." Id. at §3(c).

The excise tax on "toll telephone service" was intended to tax long distance service, while the tax on "local telephone service" was intended to tax the privilege of access to the local exchange. See Notice 2006-50 (setting forth the definitions of Section 4252 and then establishing two distinct categories "local-only service" and "long distance service.") Since the definition of "long distance service," included any service were the persons telephone is outside the local telephone system of the caller, there is serious doubt as to the United States present argument that access to a local telephone system outside of Comcation's own local calling area is within the definition of "local telephone service."

**4. Legislative History**

Like the case of the term "necessary or unique" in Western Electric, the legislative history is silent as to the term "access" and "constituting a part of such local telephone system." See House Representatives Report 89-433, 1965 U.S.C.C.A.N. 1645, 1676-78. The legislative history does note that the tax levied in §4252(a)(1), "local telephone service" was for the "**right of access** to a local telephone system and the privilege of telephonic quality communication...." Id. at 1677-78 (emphases added). This statement supports Comcation's position that an inward dial line does not meet the definition of "local telephone service,"[9] since Comcation does not have the right to access the local calling area on their own accord.

**5. Congressional Initiatives**

In 2005, when the Joint Committee on Taxation examined subjecting Internet access and other new technologies to taxation under IRC Section 4252, Congress once again stepped in. See "Options to Improve Tax Compliance and Reform Tax Expenditures," January 27, 2005, pages 368-378 (Joint Committee on Taxation) (applicable excerpts attached hereto as Exhibit F); S. 758 (109th Congress 2005) (legislation introduced by Congressman Allen "to ensure that the federal excise tax on communication services does not apply to internet access service."[10] Interestingly, this legislation proposed adopting

[9] See Comcation's Pre-Trial Brief, page 12, for a more extensive discussion.

[10] There are presently other Bills pending that would eliminate the Federal excise tax on communications. HR 1898. Since that time the Senate has also introduced S 1321. This Act, if enacted would repeal the communications excise tax and fund the IRS's efforts to process refunds for the "toll telephone" issue

the definition of "internet access service" contained in the Internet Tax Freedom Act, which would also include the PRI lines (dial access) at issue in the present matter. See S.758; 47 U.S.C. 151 note (Internet Tax Freedom Act). Perhaps as interesting however, is the Joint Committee on Taxation's recognition that amendments would be needed to IRC 4252 to bring information service (Internet access) into the scope of taxable services. See "Options to Improve Tax Compliance and Reform Tax Expenditures," page 373-375 (discussing Option 1, which contemplated no changes to the tax, and noting information services (Internet access) as "nontaxable", compare with Option 3, which would expand the tax to include, among other items, Internet access service).

Clearly, based on legislation passed by Congress and the report prepared by the Joint Committee on Taxation, Internet access, including PRI lines purchased by an ISP to provide Internet access, is presently not subject to taxation under IRC 4252. The Government will no doubt argue that their taxation of PRI lines used by Internet access providers to provide Internet access were subject to tax prior to the original Act and, therefore, are subject to Tax; however, absent Regulations or other guidance that supports this position, it hardly seems plausible that ISPs were on notice of the IRS's position.[11] At the very least, this Act again casts doubts as to the taxability of PRI lines purchased by Internet Service Providers to provide Internet access.

Like the facts in Western Electric, the IRS has failed to clarify the definition of the words in question before the Court with regulatory guidance, despite almost

---

discussed in Internal Revenue Bulletin: 2006-25. The Bill is discussed in more detail in Senate Report Number 109-336. The bill was placed on the Senate's Legislative Calendar under General Orders on September 15, 2006. http://thomas.loc.gov.

[11] The Internet Tax Freedom Act states that a tax was "generally imposed and actually enforced" prior to the prohibition if "a provider of Internet access services had a reasonable opportunity to know by virtue of a rule or other public proclamation...." 47 U.S.C. 151 note (Internet Tax Freedom Act), Section 1101 (definitions).

40 years of confusion. In addition, the fact that the only legislative history supports Comcation's position, taken along with the IRS apparent acknowledgment in their proposed regulatory notice that new technologies are not addressed in the 1965 Act, as well as the Internet Tax Freedom Act and the legislative initiatives to prevent ISPs from being charged Federal and State taxes all leave serious doubt as to the taxability of PRI lines purchased by ISPs. That doubt must be found in favor of Comcation.

As the Court in Fortis stated when it rejected the IRS's attempt to unilaterally update the definition of toll telephone service, "this case does not even involve a drafting error; it involves a disconnect between a forty-year old tax scheme and recent innovations in the telecommunications industry. It is plainly Congress's responsibility to decide whether to revise the statute to accommodate such developments." Fortis, Inc. v. U.S., 2004 WL 2085528. The definition of "local telephone service" is also no longer in synch with modern technology. It is not possible to fit incoming PRI service purchased by Internet Service Providers into the definition without "updating the definition."

If the Court adopts Comcation's reasonable interpretation of "local telephone service" then they must hold in favor of Comcation as a matter of law. Alternatively, if the Government's interpretation leaves any doubt as to taxability of the Taxpayer's purchase of PRI, that doubt must be resolved in favor of the Comcation as a matter of law.

**II. The Planitiff's purchase of PRI lines are not subject to the federal excise tax found in 26 U.S.C. §4252(a)(1), since they are private communications, therefore excluded from the definition of local telephone service.**

Even if this Court finds that some of the lines at issue meet the definition of "local telephone service," they still are not taxable to the extent that they are "private communication service."

**A. The PRI purchased by Comcation gave them the exclusive or priority use of the channels.**

"The term "local telephone service" does not include any service which is a "toll telephone service" or a "private communication service" as defined in subsections (b) and (d)." 26 U.S.C. §4252(a)(2). A "private communication service" is defined by the Code as follows:

> (1) the communication service furnished to a subscriber which entitles the subscriber- (A) to **exclusive or priority use of an communication channel or groups of channels**, or (B) to the use of an intercommunication system for the subscriber's stations, regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c) [local, toll and teletypewriter, respectfully]...." 26 U.S.C. 4252(d) (emphasis added).

There have been few cases dealing with this issue, since the amendment of the section in 1965. <u>Western Electric Company, Inc</u>. dealt with the "taxability of the associated services used in connection with Centrex systems." <u>Western Electric Co</u>., at 57. The case dealt with an interpretation of Section 4252 (d) (2) "other associated services which

are provided in connection with, and are necessary or unique for use of…." 26 U.S.C. 4252.

Revenue Ruling 78-437 was on point and held that lines connecting a private communication "system to the local telephone exchange…" were not within the private communication service exclusion. Rev. Rul. 78-437. There was, however, no basis given for their decision.[12] See Id. Rev. Rul. 78-437 evidences no thoroughness evident in its consideration, nor validity in its reasoning. As the Court points out in Office Max, Inc. "the level of deference to be accorded [Revenue Ruling] depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncement, and all those factors which give it power to persuade, lacking power to control." Office Max, Inc. at 998 (citing Mead, 533 U.S. at 228). In other words, the amount of deference given a Revenue Ruling depends on its "power to persuade." Id. at 998. If the interpretation is not reasonable it is "entitled to no deference." Id. Here, the Revenue Ruling has no reasoning and, therefore, should be afforded no deference.

With no clear definition or reasoning emerging from the cases we are once again drawn to our basic rule of statutory interpretation. "In all cases of statutory construction, the starting point is the language employed by Congress." Office Max, Inc., at 992

[12] This holding is consistent with the treatment of "general telephone service" prior to Congress's enactment of the definition of "private communication" contained in Section 4252 (d) in 1965. Pub.L. 89-44 (substituted definition of "local telephone service" for definition of "general telephone service"). This also, may explain the holding in Rev. Rul. 78-437. Specifically, prior to 1965, a line was within the definition of "general telephone service" (the predecessor of "local telephone service") if it was "connected (directly or indirectly) to an exchange operated by a person engaged in the business of furnishing communication service, if by means of such connection communication may be established with any other fixed or mobile telephone or radio telephone station…." Internal Revenue Code, pg 8076 (Thomas RIA 2004) (annotation to §4252, 1958 Excise Tax Technical Changes Act of 1958 (P.L. 85-859)). As such, a line that was not connected to an exchange was not within the definition of "general telephone service. See Id.

(citing Chapman v. The Higbee Company, 319 F.3d 825, 829 (6th Cir. 2003). The words of the statute are clear. If Comcation has **"exclusive or priority use of a communication channel or groups of channels"** then the channel is a private communication service. If the language employed by Congress is clear, there is no need to look beyond the statue. See Id.

**Exclusive** is defined as "excluding or having power to exclude…limiting or limited to possession, control, or use by a single individual or group." Merriam-Webster's at 436. **Priority** is defined as "superiority in rank, position, or privilege." Id. at 988. The definitions taken together are clear. If Comcation and its customers (group) have the privilege of the use of the channels (PRI), superior to others in the local calling area, then the PRI are "private communication service."

In the present case all the evidence established that the PRI lines were open circuits, which were always complete. The PRI circuits were not initiated and closed on a call by call basis. The lines themselves were used to aggregate traffic between the central offices, where an Internet customer dialed in, and Comcation's network access servers which were located in Doylestown. Since these circuits were open and always complete and exclusively carried aggregated traffic to Comcation's network access server, it is clear that the PRI lines had the priority and exclusive characteristics necessary to bring them within the definition of "private communication service."

**B. The PRI purchased connected a local calling area switch to another local calling area switch, again making them "private communications"**

The definition of a "private communication service" also includes "the channel mileage which connects a **telephone station located outside a local telephone system area with a central office in such local telephone system**...."[13] 26 U.S.C. §4252(d)(3) (emphasis added).

In addition to the general characteristics of all of the PRI lines, the lines that connected Comcation's network access servers to calling areas outside the one that they were located had an additional quality. Specifically, these PRI lines were charged a flat rate, based on distance and ran across local calling areas. They connected Comcation's network access servers (telephone station) with the central office of calling area outside of Comcation's local telephone system area. Dr. Hills testified that the lines that ran from one local calling area to the other, the PRI lines that originated outside of Doylestown were "private line(s)." He also referred to this connection outside of the local calling area to Doylestown as "a private pair of wires to some other location." In addition to the general characters of all of the PRI lines, always complete circuits, we would also submit that the lines that crossed local calling areas were without question exclusive to Comcation and fit within the definition of "private communication services."

Based on the application of the facts in the present case to the definition of "private communication service" this Court should hold that any PRI lines that connected Comcation's network access servers in Doylestown to the central office of a local calling area outside of Comcation's local calling area (Doylestown) are within the definition of

[13] The definition also requires that the service be separately charges. The PRI lines are either the only charge (XO Communications and Bell Atlantic) or they are separately stated. On the TCG bill for example the ISP PRI Arrangements are separately stated and charged. PX4, Bates Stamp 568a. The DID number is also separately stated.

"private communication service" and should be excluded from the federal communication excise tax.

CONCLUSION

For all of the above stated reasons, the Plaintiff's purchases of PRI lines are outside the scope of the Federal Excise Tax on communications. As such, Comcation respectfully requests that this Court grant their refund request.

11/13/06
Date

Respectfully submitted,

Anthony C. Gulotta, Esquire
PA Atty. ID #82081
Anderson & Gulotta, P.C.
1110 North Mountain Road
Harrisburg, PA 17112
(717) 635-7145
Fax (717) 541-5434
tgulotta@fbstax.com
Attorney for Plaintiff