**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 05-515 T**
**(Judge Allegra)**

COMCATION, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

# DEFENDANT'S POST-TRIAL BRIEF

EILEEN J.O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
G. ROBSON STEWART
JACOB E. CHRISTENSEN
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-0878

## Table of Contents

Page

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Comcation's PRI services constitute taxable local service under the statute because they allowed anyone in the various local exchange areas to place a local call and establish two-way communication of telephonic quality with Comcation's network.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Comcation's PRI services are taxable even if they were configured to prevent outgoing calls. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. Even if Comcation's PRI services are found to be "toll telephone service" under § 4252(b)(2), they are still subject to the excise tax. . . . . . . . . . . . . . . . . . 12

IV. Comcation's reliance on Private Letter Ruling 200133008 is misplaced because Comcation does not fall within the IBM exception to the general rule that such IRS determinations may not be cited.. . . . . . . . . . . . . . . . . . . . . . . 15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Table of Authorities

**Cases:**

*Am. Bankers Ins. Group, Inc. v. United States*, 408 F.3d 1328 (11th Cir. 2005). . . . . . . 14

*Bornstein v. United States*, 170 345 F.2d 558 (Ct. Cl. 1965). . . . . . . . . . . . . . . . . . . . . . 15

*Clayton v. United States*, 33 Fed. Cl. 628 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990). . . . . . . . . . . . . . . . 7, 8, 10

*Exxon Corp. v. United States*, 45 Fed. Cl. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fortis, Inc. v. United States*, 447 F.3d 190 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 14

*Int'l Bus. Mach. v. United States*, 170 Ct. Cl. 357 (1965). . . . . . . . . . . . . . . . . . . . . . . . 15

*Knetsch v. United States*, 348 F.2d 932 (Ct. Cl. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Cases (continued)** **Page**

*Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005). . . . . . . 12, 14

*OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 14

*Reese Bros. v. United States*, 447 F.3d 229 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 14

*Schlumberger Tech. Corp. v. United States*, 55 Fed. Cl. 203 (2003).. . . . . . . . . . . . . . . . 15

**Statutes:**

Internal Revue Code of 1986(26 U.S.C.):

§ 4251.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 13

§ 4252.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

§ 4253.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

§ 4254.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

§ 6110.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Miscellaneous:**

The Excise Tax Reduction Act of 1965, Pub. L. No. 89-44, §§ 302, 809,
79 Stat. 136 ("1965 ETRA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. Rep. No. 89-433 30 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

S. Rep. No. 89-324 35 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Private Letter Rulings:

200133008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Revenue Rulings:

75-9, 1975-1 C.B. 348. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

77-196, 1977-1 C.B. 343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

79-245, 1979-2 C.B. 380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Miscellaneous (continued)** **Page**

79-405, 1979-2 C.B. 383. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Notices:

Notice 2006-50, 2006-25 I.R.B. 1141. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Dictionaries:

*Newton's Telecom Dictionary* (17th ed. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-515 T
(JUDGE ALLEGRA)

COMCATION, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

DEFENDANT'S POST-TRIAL BRIEF

The United States submits its post-trial brief pursuant to the Court's Order of September 28, 2006.

## INTRODUCTION

Comcation, an Internet Service Provider located in southeastern Pennsylvania, seeks a refund of excise taxes it paid on telecommunications services during the period October 1, 1998, through February 1, 2002, for the total amount of $10,224.05.[1] (Pl. Ex. 2.) During that time, Comcation used these services to create a network to connect its dial-up users to the Internet. With two exceptions, the services at issue in this case are Primary Rate Interface (PRI) services

[1] At trial, plaintiff abandoned its claim for taxes paid on services from two accounts, reducing its original claim by $115.16, from $10,339.21 to $10,224.05. (Tr. at 56.)

that Comcation purchased from Verizon (formerly Bell Atlantic), AT&T (formerly TCG), and XO Communications. (Pl. Ex. 2.) The exceptions are an SMDS and an ISDN account from Bell Atlantic, one of which Comcation used to connect its network to the Internet backbone (Tr. at 52), and the other to connect its data center to the home of Mitchel Smith, Comcation's founder (Tr. at 69). Neither of these services provided access to a local exchange or enabled plaintiff to communicate with persons in the local telephone system, but were for the dedicated use of Comcation. Therefore, the Government concedes that these services fall within the private line exception to the excise tax, as defined in § 4252(d)(1), and Comcation is entitled to a refund of $176.26 for taxes paid on them.

The PRI services, which constitute the remainder of Comcation's claim, were used to connect Comcation's network to various local exchanges located in southeastern Pennsylvania. (Network Diagram, Pl. Ex. 1.) These connections enabled Comcation's customers to access the Internet through Comcation's network by dialing Comcation's local telephone number with their computer, according to the process described in detail in the parties' stipulation of facts, filed on September 6, 2006. (Stip. 6-9.) Comcation advances several arguments that it is not liable for the excise tax imposed by § 4251 on these services. First, Comcation sought to establish at trial that its PRI services do not satisfy the definitional requirements of local telephone service under § 4252(a) because they connected its network to distant local exchanges beyond that of Doylestown. Second, Comcation argues that its services are not local telephone service because they purportedly allowed it to receive incoming calls, but not to make outgoing calls. Therefore, according to Comcation, it did not have the privilege of communication with substantially all persons having a telephone in the local telephone system. Third, Comcation sought to establish

at trial that its services are excluded from the definition of local service because they constitute toll telephone service, defined in § 4252(b)(2). Comcation apparently believes that such service is no longer subject to tax. Finally, Comcation argues that it is entitled to a refund based on a private letter ruling issued to another taxpayer that purportedly involved the same type of service, and that to deny Comcation a refund would violate equal protection principles. For the reasons stated below, Comcation's PRI services constitute local telephone service, as defined in § 4252(a), and are subject to the telephone excise tax imposed by § 4251.

## ARGUMENT

### I. Comcation's PRI services constitute taxable local service under the statute because they allowed anyone in the various local exchange areas to place a local call and establish two-way communication of telephonic quality with Comcation's network.

#### A. Under the statutory language, access to *any* local telephone system constitutes local telephone service if it provides the privilege to communicate with stations that make up part of that same local telephone system.

Section 4252 of the Internal Revenue Code defines local service as follows:

> (a) Local telephone service.--For purposes of this subchapter, the term "local telephone service" means--
>
> > (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
> >
> > (2) any facility or service provided in connection with a service described in paragraph (1).
>
> The term "local telephone service" does not include any service which is a "toll telephone service" or a "private communication service" as defined in subsections (b) and (d).

For the first time at trial, Comcation sought to establish that the bulk of its PRI services did not provide local telephone service, as defined in § 4252(a), because they connected its

network to local exchanges other than the local exchange located in Doylestown, Pennsylvania, where Comcation is physically located. However, the statute does not require that local service be purchased from the exchange physically located nearest the subscriber to qualify as local telephone service. Instead, it is the access to *a* local telephone system that constitutes local telephone service if it provides the privilege to communicate with stations (i.e., telephones)[2] that make up part of *such local telephone system.*

Comcation's PRI services constitute taxable local service because they provided it with access to not only one, but to several different local exchanges, including that of Doylestown, Hatboro, Levittown, Ardmore, etc. (Pl. Ex. 1; Tr. at 36, 96-97.) Comcation's network consisted of several PRI service lines. (Pl. Ex. 1.) Each line provided a direct connection between Comcation's network and one of the local exchanges. (*Ibid.*; Stip. 7, 8.) Each of these connections allowed anyone within that particular local exchange to call Comcation's network (Stip. 11) by dialing a number that was local to the caller (Tr. at 122). Comcation's server, in conjunction with a modem, would answer the call, regardless of whether the caller were one of Comcation's customers. (Stip. 9; Tr. at 66-67.) Thus, under the statute, Comcation had access to "*a* local telephone system"; several, in fact; and the ability to answer calls placed by anyone from each of those areas.

[2]Newton's Telecom Dictionary (17th ed. 2001) defines the word "Station" as "A semi-dumb word for a telephone." The dictionary explains that the word may have been derived from the telegraph system in the United States, which was based on a network of telegraph wires strung between railroad stations. When the telephone system reached the American frontier, the most efficient way to install it was to replace each telegraph with a telephone.

For example, someone in the Ardmore exchange could access Comcation's network by dialing a local Ardmore number. (Stip. 6; Tr. at 122.) The call would be transmitted through the caller's local loop to the local exchange in Ardmore. (Stip. 7; Tr. at 122.) The call would then be extended to Comcation's modems in Doylestown through the PRI service lines.[3] (Stip. 8; Tr. at 122.) In this example, Dr. Hills explained that the Ardmore exchange would originate and terminate the call (Tr. at 123, 124) and provide the dial tone. (Tr. at 144.) The switching services of the Doylestown local exchange (where Comcation is physically located) would not be involved.[4] (Tr. at 125.) Instead, one Ardmore station would be making a local call (Tr. at 123-24) to another local Ardmore station, with one being connected over some distance through an external wire (Tr. at 144). The same would be true if Comcation, rather than an Ardmore caller, were to initiate the call to Ardmore using its PRI service to Ardmore. (Tr. at 144-45.)

According to Dr. Hills' unrebutted testimony, the PRI service to Ardmore in the example above provided Comcation with local telephone service in Ardmore. (Tr. at 123-24.) Likewise, the PRI services to the other local exchanges beyond Doylestown provided local telephone service in each of those areas. The very purpose of this type of network structure is to provide local numbers for dial-up users so that they may avoid incurring toll charges. (Tr. at 97, 122.) Newton's Telecom Dictionary defines this type of arrangement as providing local telephone service:

---

[3]Dr. Hills, the Government's expert, referred to this type of set-up as an "out-of-area telephone line" or an "exchange line." (Tr. at 133.) He explained that it has been a type of network optimization for many years. (Tr. at 124.)

[4]Based on Comcation's network diagram, the PRI service line to Ardmore does not pass through the Doylestown local exchange. (Pl. Ex. 1; Stip. 8; Tr. at 98.)

> Foreign Exchange Service: Provides *local telephone service* from a central office which is outside (foreign to) the subscriber's exchange area. In its simplest form, a user picks up the phone in one city and receives a dial tone in the foreign city. He will also receive calls dialed to the phone in the foreign city. This means that people located in the foreign city can place a local call to get the user. The airlines use a lot of foreign exchange service. Many times, the seven digit local phone number for the airline you just called will be answered in another city, hundreds of miles away.

*Newton's Telecom Dictionary* 287 (17th ed. 2001) (emphasis added). Thus, under the statute, Comcation's PRI service lines to each of the local exchanges provided it with access to a local telephone system, taxable under § 4252(a)(1). *See* Rev. Rul. 75-9 (holding that foreign exchange service constitutes local telephone service under § 4252(a)). At the very least, the PRI services are described under § 4252(a)(2) as any facility or service provided in connection with access to a local telephone system.

B. Comcation's PRI services allowed any caller in the various local exchange areas to establish two-way communication with Comcation's system.

The parties have stipulated that the communication was of telephonic quality. (Stip. 10.) This two-way communication would occur during the authentication process, once a call was established: After answering a call, Comcation's server would query the caller's computer for a username and password. (Stip. 9; Tr. at 66, 75, 99-100.) The query would travel from Comcation's server, over the PRI service lines to the particular local exchange, and to the caller's computer. (Tr. at 77-78, 99-100.) While this was happening, the caller would hear a "screeching" sound from Comcation's modem (Stip. 9), and the caller would eventually be prompted to enter a username and password (Tr. at 77, 99). The caller's response would be communicated back along the same path to Comcation's server. (Tr. at 78, 99-100.) This two-way communication continued while callers sent and received information to and from the

Internet (Stip. 5, 12 (last sentence)) and demonstrates Comcation's privilege of telephonic quality communication with anyone who placed a call to Comcation, even if, as Comcation asserts, it was unable to initiate the call.

These facts establish that all of the PRI services provided Comcation with access to a local telephone system and the privilege of telephonic quality communication with substantially all persons having telephone service within such local telephone system. Comcation's choice to limit its services to customers does not negate Comcation's privilege, if it so desired, to use its equipment to connect any caller in the local exchange areas to the Internet. It is the existence of this privilege, and not the actual use of the service by the taxpayer, that determines the service's taxability. *See Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128, 130-131 (1990); Rev. Rul. 79-245, 1979-2 C.B. 380.

II. Comcation's PRI services are taxable even if they were configured to prevent outgoing calls.

Comcation's PRI services are taxable even if they were configured to prevent outgoing calls because (1) the services were capable of both originating and receiving calls, regardless of how Comcation chose to configure or use them, and (2) the ability to initiate calls is irrelevant under the statutory definition of local telephone service.

A. Comcation's PRI services provided it with the capability to initiate and receive calls.

In our pretrial brief, we recited the facts in *Comdata* and supporting revenue rulings for the proposition that the capability of a service, not just its use, governs the imposition of the communications excise tax. The court's decision was grounded on the fact that the service at issue was inherently capable of more expansive use than that employed by the taxpayer, which had placed its own restrictions on the service. Specifically, the taxpayer argued that taxability is

governed by the actual use made of the service, and that the tax did not apply to it "since *Comdata* [had] *configured* the OUTWATS service so as to restrict its use to communications that [could] only reach the service centers." 21 Cl. Ct. at 130 (emphasis added). The court rejected the taxpayer's argument because the service nevertheless entitled Comdata to the "privilege" of unlimited calls: "That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege." *Id.* at 131. The court then rejected the taxpayer's next argument that its services were similar to a service described in Revenue Ruling 79-405, which was held not to attract the tax. The court noted that the service in the revenue ruling provided its customers with only limited, pre-determined telephonic connections, and was "inherently incapable of being used more expansively." The court continued:

> Plaintiff's system, on the other hand, has *no inherent use limitation*. The opportunity for broad area access is there if plaintiff chooses to use it. For purposes of the communications tax, this difference is critical. In the case of Service 2 [described in the revenue ruling], there was no capability of broad area telephone communication, hence, that service offered no privilege for such use. In the case of plaintiff's WATS lines, however, the capability for wide area usage exists and therefore also the privilege for such use.

*Id.* (emphasis added).

At trial, Comcation attempted to establish that its PRI services were configured to prevent outgoing calls by Comcation, even though Mr. Smith, Comcation's owner and sole witness, had no personal knowledge as to whether outgoing calls could be made. Mr. Smith never attempted to make an outgoing call. (Tr. at 67.) Dr. Hills testified that, based on the evidence, he did not know how Comcation's services were actually configured. (Tr. at 148-49.) He also testified that he had no personal knowledge about telephone companies' practices to configure PRI services they provide to ISPs as incoming, outgoing, or both. (Tr. at 95, 148-49.) Indeed, there is no

evidence in the record that any set practice even exists. Furthermore, the tariffs showed that any channel or line group within each PRI service line (each line consisting of 23 usable channels) could be provisioned as outgoing, incoming, or both, while the remaining channels or groups within the same line could be provisioned in a different manner. (Pl. Ex. 5 at 3; Def. Ex. 1 at A-27, para. (2); Stip. 12.) Dr. Hills testified that there are many reasons why an ISP would want to make outgoing calls, *i.e.* to terminate void calls. (Tr. at 120.) Therefore, there is no reason to believe that Comcation's providers did not configure at least one channel of the PRI services to allow for outgoing calls, and Comcation has not shown otherwise.

More importantly, however, and determinative of this issue; the facts are clear that the PRI services were capable of both receiving and initiating calls, regardless of how Comcation chose to configure or use them. The parties have stipulated as much. (Stip. 12.) Additionally, the tariffs, which describe the conditions of the PRI service, state specifically that the service did not preclude a customer from initiating calls:

> Basic IntelliLinQ PRI service does not preclude the customer from originating or receiving circuit-switched voice calls from inside or outside either his/her serving central office or his/her Local Exchange Area.[5]

(Pl. Ex. 5 at 7; Def. Ex. 1 at A-28, para. (b)(3).) Dr. Hills explained that this paragraph means precisely that the service allows customers to both make and receive calls. (Tr. at 105, 109.) Dr. Hills testified that PRI services were and are commonly used by a wide variety of customers, other than ISPs, that would use the service to make outgoing calls, including telemarketers, call

---

[5]Dr. Hills gave his opinion that the service Comcation ordered was the Basic IntelliLinQ service rather than the Enhanced IntelliLinQ service. (Tr. at 103-04.) He explained that Comcation would not have needed so many PRI service lines if they had purchased the Enhanced service. (Tr. at 103-04.) At any rate, Dr. Hills also testified that the Enhanced service also would not have precluded the customer from originating calls. (Tr. at 104, 106.)

centers, or any business that has a need for 20 or more lines and doesn't want to pay extra for separate lines. (Tr. at 93-95.)

Notably, the tariffs reflect that Comcation, or any other customer, could choose to configure individual channels or groups of channels as incoming, outgoing, or both, *with no cost differential*.[6] (Pl. Ex. 5 at 3, 11; Def. Ex. 1 at A-29, para. (d)(1).) Dr. Hills also testified that in all the tariffs he had examined, he had never seen a difference in cost based on channel configuration. (Tr. at 94.) Even after Comcation selected its initial configuration, it could be changed for a one-time fee of $50, at least for the Bell Atlantic services. (Pl. Ex. 5 at 16, para. g; Tr. at 107.) The telephone company would perform the reconfiguration by simply adjusting a "flag" in its computer. (Tr. at 148.)

Therefore, like the service in *Comdata*, Comcation's PRI services were inherently capable of being used more expansively than for incoming calls only. There was no inherent use limitation in the PRI services Comcation purchased. That Comcation "requested" incoming only lines (Tr. at 45) does not negate the privilege provided by the services to both receive and initiate calls, nor did it prevent Comcation from later changing its configuration for a small fee. Indeed, the mere fact alone that Comcation was able to select its own configuration, with no cost differential, confirms the existence of the privilege. Any limitation on Comcation's ability to make outgoing calls was self-imposed, and taxability under § 4251 is not governed by such restrictions placed by the taxpayer.

---

[6]The relevant provisions in the Bell Atlantic tariff (Pl. Ex. 5) are found on page 3 and page 11. Page 3 refers to "business dial tone line" groups as being configured as incoming, outgoing, or two-way. Page 11, paragraph C.1.a. provides that the business dial tone line functionality is *included* in the PRI service rates and charges. In the XO tariff (Def. Ex. 1), a similar provision is found on page A-29, paragraph (d)(1).

B. Taxability under § 4251 does not depend upon the ability of a service to initiate calls.

Even if the Court were to hold that Comcation's PRI services were inherently incapable of initiating calls, Comcation would not be entitled to a refund because the ability to initiate calls is irrelevant under the statutory definition of local telephone service. Section 4252(a) specifically states that it is the "access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system," which governs taxability of the service. The Service noted in Revenue Ruling 77-196, 1977-1 C.B. 343 that § 4252(a) "makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls." *Id*. at 344. In holding that the services at issue in the ruling were subject to the tax, the Service concluded that a customer's ability to initiate calls through the service was "not material to the tax determination." *Id.* The statute, as confirmed by a long line of revenue rulings that we cited in our pretrial brief, does not define local service on the basis of the ability to initiate calls, but rather on the basis of any access to the local telephone system. "Incoming only" access is nevertheless access under the plain meaning of the statute.

In this case, there is no dispute that the PRI services allowed Comcation the privilege to communicate with anyone who placed a call to Comcation, even if, as Comcation asserts, it was unable to initiate the call. (Stip. 9, 12.) The services allowed Comcation's system to engage in two-way communication with any local caller. This two-way communication occurred when a call was answered, during the authentication process, and continued once a caller gained access to Comcation's network. Therefore, even if Comcation could not initiate calls, the PRI services nevertheless gave it access to a local telephone system and the "privilege of telephonic quality

communication with substantially all persons having telephone" service on such local system, which is taxable under § 4252(a).

III. Even if Comcation's PRI services are found to be "toll telephone service" under § 4252(b)(2), they are still subject to the excise tax.

At trial, for the first time in this case, Comcation sought to establish that its PRI services constitute toll telephone service under § 4252(b)(2), and are excluded from the definition of local service. Comcation's purpose in raising this new argument appears to be based on the IRS's recent concession, announced by Notice 2006-50, 2006-25 I.R.B. 1141, that it would follow the holdings of several circuit courts that a telephonic communication for which there is a toll charge that varies with elapsed transmission time but not distance is not taxable toll telephone service as defined in § 4252(b). Comcation erroneously believes that its services may not be taxable pursuant to these rulings.

In our pretrial brief, we briefly described the legislative history of the communications excise tax up through the enactment of the of The Excise Tax Reduction Act of 1965 ("ETRA"). *See* Pub.L. No. 89-44, § 809, 79 Stat. 136. When ETRA was enacted in 1965, only AT&T provided long-distance telephone service. It offered two billing plans–MTS (based on duration, distance, and time of day) and WATS (Wide Area Telephone Service). Under the WATS plan, customers purchased blocks of usage time for a flat fee. The customers paid either a flat monthly rate for an unlimited number of calls and minutes or a lower rate for up to fifteen hours of calling plus a further charge for each additional hour. *See Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374, 375 (D.C. Cir. 2005). Congress intended current subsection (b)(1) of § 4252 to apply to AT&T's MTS service and subsection (b)(2) to cover its WATS service. *See* H.R.Rep.

No. 89-433, at 30 (1965); S.Rep. No. 89-324, at 35 (1965). Section 4252(b)(2) defines "toll telephone service" as follows:

> (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

26 U.S.C. § 4252(b)(2).

Comcation's PRI services are properly taxed under § 4252(a) as local telephone service, rather than as toll telephone service under § 4252(b)(2), which was intended by Congress to apply to AT&T's WATS service. Dr. Hills testified that no toll charges were incurred by Comcation or its dial-up users (Tr. at 122) and the invoices support that conclusion.

But even if Comcation's PRI services were excluded from the definition of local telephone service as toll telephone service, they would still be subject to the tax imposed by § 4251 on toll telephone service. Section 4251(a) imposes an excise tax of 3 percent on amounts paid for "communications services." Communications service means local telephone service, toll telephone service, and teletypewriter exchange service. I.R.C. § 4251(b). Therefore, although local telephone service does not include toll telephone service, I.R.C. § 4251(a), both types of service are nevertheless subject to the same tax. The distinction between local and toll telephone service becomes material only in applying the exemptions of § 4253 and in computing the tax under § 4254(b) for toll telephone service in coin-operated telephones, neither of which is at issue in this case.

Furthermore, the IRS's announcement in Notice 2006-50 that it would follow the holdings of several circuit courts is of no help to Comcation. In each of those cases, the court

held that the services at issue did not satisfy the definition of local telephone service or toll telephone service under either §§ 4252(a) or 4252(b). *See Am. Bankers Ins. Group, Inc. v. United States*, 408 F.3d 1328 (11th Cir. 2005); *OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005); *Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005); *Fortis, Inc. v. United States*, 447 F.3d 190 (2d Cir. 2006); *Reese Bros. v. United States*, 447 F.3d 229 (3d Cir. 2006). The courts in these cases generally held that the long-distance services at issue did not satisfy § 4252(b)(1) because the charge for the service did not vary based on time *and* distance of each call, but was instead calculated according to the elapsed time of each individual call, multiplied by a specified rate that was unrelated to distance. The courts likewise held that the services at issue were not toll telephone service under § 4252(b)(2) because the charges for the services were not periodic charges within the meaning of the statute, but instead were a summation of toll charges for individual communications. Finally, the courts rejected the Government's argument that the services were local telephone service merely because all long-distance calls would eventually require access to a local telephone system.

Comcation, on the other hand, seeks to establish that its PRI services are excluded from local service precisely because they are described by paragraph (2) of § 4252(b). If Comcation is right, then its services are subject to the tax as toll telephone service.

IV. Comcation's reliance on Private Letter Ruling 200133008 is misplaced because Comcation does not fall within the *IBM* exception to the general rule that such IRS determinations may not be cited.

Section 6110(k)(3) prohibits the use or citation as precedent of "written determinations" such as private letter rulings. *See, e.g.*, *Exxon Corp. v. United States*, 45 Fed.Cl. 581, 668 n. 180 (1999) (finding a letter ruling cited by the plaintiff "totally irrelevant") *aff'd in part, rev'd in part on other grounds*, 244 F.3d 1341 (Fed.Cir. 2001); *Clayton v. United States*, 33 Fed.Cl. 628, 639 (1995) (because of the statutory prohibition, the court "cannot rely on [a] letter ruling") *aff'd*, 91 F.3d 170 (Fed.Cir. 1996) (table), *cert. denied*, 519 U.S. 1040. A very limited exception to this general rule was established in *Int'l Bus. Mach. v. United States*, 170 Ct. Cl. 357 (1965), *cert. denied*, 382 U.S. 1028, which precludes the Commissioner from issuing private letter rulings that treat competing taxpayers differently.

To fall within the *IBM* exception, Comcation had to show that it applied for a private letter ruling at the same time its competitors did, and that it was thereafter treated differently in an abuse of discretion by the Commissioner. *Knetsch v. United States*, 348 F.2d 932, 940 (Ct. Cl. 1965); *Bornstein v. United States*, 170 345 F.2d 558, 564 (Ct. Cl. 1965). At trial, Mr. Smith, Comcation's owner, testified that he never sought a private letter ruling from the IRS with regard to the taxability of Comcation's PRI services. (Tr. at 67-68.) That fact alone is fatal to Comcation's argument. *Schlumberger Tech. Corp. v. United States*, 55 Fed. Cl. 203, 223 (2003). Moreover, Comcation failed to show that it was a competitor with the taxpayer in the private letter ruling. The facts in the letter ruling state that the taxpayer would purchase PRI services from local telephone companies to construct its own communications network. Taxpayer would then sell access to its network, including use of the PRI services, to ISPs, which in turn provided internet access services to their customers. (*See* Private Letter Ruling 200133008, marked as

Def. Ex. 2 for identification.) Based on these facts, it is clear that the taxpayer in the letter ruling was not an ISP that was in the business of selling internet access service to dial-up customers. Therefore, that taxpayer was not in competition with ISPs, such as Comcation. Rather, the taxpayer purchased PRI service lines from local telephone companies, and in competition with the *telephone companies*, sold access to those services to ISPs. Therefore, Comcation does not fall within the *IBM* exception.

## CONCLUSION

Based on the foregoing, plaintiff is not entitled to a refund for excise taxes paid on its PRI services, and its refund should be limited to $176.26, which represents the amounts paid on its private line services.

Respectfully submitted,

November 13, 2006
Date

s/Jacob Christensen
JACOB E. CHRISTENSEN
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-0878

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief
Court of Federal Claims Section
G. ROBSON STEWART
Reviewer

November 13, 2006
Date

s/G. Robson Stewart
Of Counsel

Attorneys for Defendant