**ELECTRONICALLY FILED ON 12/13/2006**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-515 T
(JUDGE ALLEGRA)

COMCATION, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

POST TRIAL REPLY BRIEF

The Plaintiff, Comcation, Inc., (hereinafter "Plaintiff" or "Comcation"), through their Attorney Anthony C. Gulotta, in response to the Court's Order Requesting a Post Trial Reply Brief dated September 28, 2006, submits this Post Trial Reply Brief in the present matter. The arguments set forth in Comcation's Pre-Trial Brief and Post-Trial Brief are incorporated by reference herein.

TABLE OF CONTENTS

PAGE

**TABLE OF AUTHORITIES** .......... iv

**INTRODUCTION** .......... 1

**I. The Lines Purchased by Comcation are within the definition of "private communication service" and are, therefore excluded from the definition of "communication services" subject to tax under Section 4251** .......... 2

**A. PRI lines purchased by Comcation that extended beyond their local calling area were within the definition of "private communication services" found in Section 4252(d)(3) and, therefore, excluded from the definition of "local telephone service" subject to tax under Section 4251 of the Internal Revenue Code** .......... 3

**1. The PRI lines that extend beyond Doylestown's local calling area are "private communication services"** .......... 6

**2. Conflicting Revenue Rulings demonstrate the ambiguity of a code section – that ambiguity must be resolved in favor of Comcation, as a matter of law** .......... 8

**B. The Holding in USA Choice supports Comcation's argument that all the PRI lines purchased by Comcation fit within the definition of "private communication service" found in Section 4252 (d)(1) and, therefore, are excluded from the definition of "local telephone service" subject to tax under Section 4251 of the Internal Revenue Code..........9**

**II. The Government's argument that a line that provides incoming only access still provides Comcation with the privilege of access necessary to bring it within the definition of "local telephone service" is without merit..........11**

**III. The Government's argument that even if the lines in question are not "local telephone service" they must be "toll telephone service" is without merit..........16**

CONCLUSION..........19

**EXHIBITS**

**Rebuttal Testimony of Verizon Maryland, Inc., In re: Application of AT&T Communications of Maryland, LLC and TCG Maryland, Docket No. 8882(State of Maryland Public Service Commission, May 16, 2003)..........Exhibit 1**

**TCG Seattle, PrimeConnect Service Tariff, Original Price Sheet 72.1a, effective April 28, 2003, WA UTC..........Exhibit 2**

# TABLE OF AUTHORITIES

## STATUTES

26 U.S.C. §4251 .......... 2, 6, 9, 19

26 U.S.C. §4251(a) .......... 5

26 U.S.C. §4252 .......... 1, 5, 15

26 U.S.C. §4252(a) .......... 1, 6

26 U.S.C. §4252(b) .......... 5, 6

26 U.S.C. §4252(b)(1) .......... 16

26 U.S.C. §4252(b)(2) .......... 5, 16, 17, 19

26 U.S.C. §4252(d) .......... 1, 2, 3, 7, 16

26 U.S.C. §4252(d)(1) .......... 3, 4, 9, 10, 11

26 U.S.C. §4252(d)(3) .......... 6, 7, 8

## CASES

Comdata Network, Inc. v. U.S., 21 Cl. Ct. 128 (1990) .......... 12

National Railroad Passenger v. United States, 338 F.Supp.2d 22 (D.C. 2004) .......... 18

USA Choice Internet Service, Fed Cl. No. 05-525 T (2005) .......... 3, 9, 10, 11, 14, 15, 16

Western Electric Company, Inc. v. United States, 564 F.2d 53 (Ct.Cl.1977) .......... 9

## MISCELLANEOUS

I.R.B. 06-25 (June 19, 2006) .......... 18

Priv. Ltr. Rul. 200133008 (August 17, 2001) .......... 9

Rebuttal Testimony of Verizon Maryland, Inc., In re: Application of AT&T Communications of Maryland, LLC and TCG Maryland, Docket No. 8882 (State of Maryland Public Service Commission, May 16, 2003) (attached as Exhibit 1)....................12,13

Rev. Rul 73-242 (1973)....................5, 6, 9

Rev. Rul 75-9 (1975)....................5, 6, 7, 9

Rev. Rul 77-196 (1977)....................13, 14

TSB-H-83(57)S (New York State Tax Commission, July 24, 2000)....................7

TCG Seattle, PrimeConnect Service Tariff, Original Price Sheet 72.1a, effective April 28, 2003, WA UTC (attached as Exhibit 2)....................12

## INTRODUCTION

The Government has failed to show that Comcation's purchase of PRI lines are subject to the three percent Federal Excise Tax on "communication services", as a matter of law. The arguments set forth in Comcation's Pre Trial and Post Trial Briefs are included by reference herein, including Comcation's contentions of fact. This Brief specifically replies to the Government's Post Trial Brief dated November 13, 2006.

The Government has ignored the facts presented during trial and has attempted to spin a mink coat from burlap in its effort to bring the PRI lines purchased by Comcation within the scope of Section 4252(a). More to the point, the Government's argument is ambiguous and unfounded. The PRI lines at issue in this case do not allow Comcation the privilege of access with those having telephones in their local calling area necessary to bring them within the Code's definition of "local telephone service" found in Section 4252(a). In addition, many of the lines are also clearly within the definition of "private communication service" found in Section 4252(d) and are, therefore, excluded from the definition of "communication services."

Comcation set forth two issues in their Post Trial Brief. First, that the PRI lines that were "incoming only" did not meet the definition of "local telephone service" in Section 4252(a) and second that, even if they did, the lines were within the definition of "private communication service" included in Section 4252 and, therefore, were excluded from the definition of "local telephone service." The Government for their part has argued that a line can meet the definition of "local telephone service" even if the line extends to a local calling area beyond the calling area that Comcation is located in,

regardless of the fact that the lines are clearly within the definition of "private communication service." DPTB at 4. The Government also argues that the fact that PRI lines were provisioned by the telephone carriers to receive incoming calls only does not change this result. DPTB at 7. The Government reasons that anyone in the local calling area could call Comcation and, therefore, Comcation could conceivably have access to anyone in the calling area. DPTB at 11. The Government also argues that even if the lines in question are not "local telephone service" they are "toll telephone service," making the assumption that a line must be within the scope of one of the definitions.[1] DPTB at 12. The Government's arguments are without merit. In fact, when analyzed one at a time, the Government's assertions support Comcation's request for relief.

**I. The Lines Purchased by Comcation are within the definition of "private communication service" and are, therefore excluded from the definition of "communication services" subject to tax under Section 4251.**

There are several ways to qualify as a "private communication service." See 26 U.S.C. §4252(d). There are two that are applicable here. Specifically a service qualifies as a "private communication service" if:

> "(1) the communication service furnished to a subscriber which entitles the subscriber – (A) to exclusive or priority use of a communication channel or groups of channels....

[1] The Government also address's Comcation's Doctrine of Equality of Treatment argument that was discussed during the opening argument at trial. As set forth in Comcation's post trial brief, this argument has been withdrawn. The Attorney for Comcation notified the Government attorney that this issue was withdrawn and provided the two issues that were being raised in Comcation's brief on November 6, 2006. As such, no response is made to the Government's argument concerning this issue.

(3) channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system." 26 U.S.C. §4252(d)

Comcation argues that all the lines in question meet the first definition of "private communication service." In addition, Comcation argues that the lines that connect network access servers to other central offices in local calling areas outside their own meet the second definition as well. The first argument is discussed at length in Comcation's Post Trial Brief dated November 13, 2006, beginning on page 36. The second application is discussed at length beginning on page 38 of Comcation's Post Trial Brief. Here, Comcation would like to specifically address the Government's argument in their brief dated November 13, 2006. In their Post Trial Brief, the Government does not address the argument of whether or not the lines at issue meet the requirements of "private communication service" noted in §4252(d)(1). In anticipation of their simultaneous response brief we will, however, address the recent holding in USA Choice, which supports Comcation's argument.

**A. PRI lines purchased by Comcation that extended beyond their local calling area were within the definition of "private communication services" found in Section 4252(d)(3) and, therefore, excluded from the definition of "local telephone service" subject to tax under Section 4251 of the Internal Revenue Code.**

The Government argues that the fact that a line extends beyond a local calling area to another local calling area does not preclude that service from fitting within the scope of

"local telephone service." Defendant's Post Trial Brief, dated November 13, 2006 (DPTB) at 5-6. When we explore the authority presented for this assertion, however, it reveals that the PRI lines themselves, which span between Comcation's office in Doylestown and the central office of calling areas outside the one that the Doylestown office is located, are categorized in the IRS's prior Revenue Rulings as "private communication service."

The Government's argument in their Post Trial Brief raises a clarifying point not previously revealed. During the trial the Government's witness struggled to explain the nature of the PRI lines that provided local access to exchanges outside of Comcation's Doylestown exchange. See R. 121-124. Dr. Hills described these lines on several occasions as private lines; to the extent they extended the local calling area of an exchange to Comcation's location in Doylestown. R. 143:2; R. 144:24; R. 98:9-12. The Government argues that this service is "foreign exchange service." DPTB at 6. With the exception of Comcation's assertion that the PRI lines they purchased did not allow them to initiate outgoing calls and, therefore, did not fulfill the definition of "local telephone service," the lines that extended beyond Doylestown's local calling area appear to fall within this category. However, rather than undercut Comcation's argument, the Revenue Rulings cited by the Government seem to sure up the Taxpayer's position that the PRI lines are not subject to tax. First the IRS clearly has stated that the "channel mileage," in this case the PRI lines, are within the definition of "private communication service," as defined in Section 4252 and; second the IRS's conflicting Revenue Rulings demonstrate the ambiguity of the code sections at issue in the present matter.

Rev. Rul. 73-242 and Rev. Rul. 75-9 dealt with a taxpayer that operated a radio station that included a call in talk show as part of their format. There were several types of lines at issue in that matter, but only one is relevant here.

> "Service (2). In addition to providing service for local callers on the talk show, the radio station also arranges for so-called "foreign exchange service" by means of which listeners in a foreign exchange area, an area outside the local exchange area of the radio station, may by dialing a local number in the foreign exchange area reach the station and participate in the program. The telephone company makes two charges to the radio station for this service: a charge for the channel mileage to the foreign exchange area plus a charge for the local service furnished within the foreign exchange area." Rev. Rul. 75-9.

Since the IRC provides an exemption for radio broadcasting stations for local telephone service, the question before the IRS was whether this service was local or toll. See Rev. Rul. 73-242; Rev. Rul. 75-9. In Rev. Rul. 73-242 the IRS held that the service was toll telephone service, fitting within the scope of Section 4252(b)(2).

> "Section 4252(b) of the Code provides that, for purposes of the tax imposed by section 4251(a), the term "toll telephone service" means...(2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station

provided with this service is located." Rev. Rul. 73-242 (citing 26 U.S.C. §4252(b)).

The Service found that the lines that allowed talk show callers to dial a local line and call into the radio station from outside the local calling area were "toll telephone service" and, therefore, the Taxpayer was not entitled to the exemption for "local telephone service". In Rev. Rul. 75-9 the IRS reversed their position. There they held that the "foreign exchange service" lines were both local access and "private communication services." Rev. Rul. 75-9. Specifically, they reasoned:

> **"In service (2), the channel mileage furnished to connect the radio station with the local service within the foreign exchange area is private communication service as set forth in section 4252(d)(3) of the Code.** Therefore, under the provisions of section 4252(a), the tax imposed by section 4251 does not apply to the amount paid by the radio station to the telephone company for the separate charge for the channel mileage. However, the tax does apply to the amount paid by the station for the separate charge made by the telephone company for local telephone service furnished within the foreign exchange area." Rev. Rul. 75-9 (emphasis added).

1. **The PRI lines that extend beyond Doylestown's local calling area are "private communication services"**

The definition of "private communication service" in Section 4252(d) includes "channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system". 26 U.S.C. §4252(d)(3). "Channel

mileage" is airline mileage (as the crow flies) connecting a customer station to the customer wire center where the local access is provided. See TSB-H-83(57)S. In order to be considered a "private communication service" the cost must be separately stated on the invoice. See 26 U.S.C. §4252(d).

Applying the logic of Rev. Rul. 75-9 and the plain meaning of 26 U.S.C. §4252(d)(3), the PRI lines that extend from the central office of a local calling area outside of Doylestown back to the network access servers (telephone station) located at Comcation's facility in Doylestown are "private communication service." This was clear based on the Government's expert witness. Dr. Hills stated that the calls that were made by customers to their local calling area (outside of Doylestown) were "assembled into one PRI...[a]nd then that PRI is connected back to a network access server." R. 122:21-23. He reiterated the point that the network access servers are connected directly to the foreign central office and not switched between two central offices later in his testimony. R. 125:14-18.

Dr. Hills testimony made it clear that the PRI lines that extended outside of the local calling areas that they originated from were:

> "So they established a local call between their local exchange and the local exchange in the Quakertown POP. Those 23 channels are then assembled into a PRI and those 23 channels, the PRI service, is then connected to the network access by some type of private line service." R. 98:7-12

Taking this into context with Dr. Hills other comments about these lines being "private lines,"[2] it becomes clear that the PRI lines that connected central offices outside of the

[2] Dr. Hills also noted that the lines that ran from one local calling area to the other, the PRI lines that originated outside of Doylestown were "private line(s)." R. 143:2. He also referred to this connection

Doylestown central office back to Comcation's network access servers are "private communication service." These lines are also all separately stated on the TCG, AT&T, and XO Communication invoices.[3] See PX 4, 567 (TCG separately stating the "ISP PRI Arrangement" and "ISP/PRI Arrangement W/CPN Only"), PX 4, 591a (AT&T separately stating the "ISP PRI Arrangement" and "ISP/PRI Arrangement W/CPN Only") and PX4, 629 (XO separately stating the 12 PRI lines). In addition to the clear breakout noted on the invoices, this distinction is also consistent with Dr. Hills' testimony. See R. 112:4-6, 117:14-16.

These lines clearly meet the requirements of "private communication service" found in Section 4252(d)(3) and are, therefore, excluded from the Federal Excise Tax on "communication services."

**2. Conflicting Revenue Rulings demonstrate the ambiguity of a code section – that ambiguity must be resolved in favor of Comcation, as a matter of law.**

In Western Electric Company the Court noted that "conflicting revenue rulings…are strong evidence of doubt and confusion by the I.R.S. as to the correct interpretation of the statute.[4]" Western Electric Company, Inc. v. United States, 564 F.2d 53, 66 (Ct.Cl.

---

outside of the local calling area to Doylestown as "a private pair of wires to some other location." R. 144: 24. In another explanation during direct examination Dr. Hills stated "the PRI service, is then connected to the network access [server] by some type of private line service." R. 98:9-12.

[3] For example, the TCG (including AT&T) invoices clearly break out the cost of the channel mileage. See 591a. When you look at the invoice you can see the cost of the four phone connections to the local calling area (known as "Primeconnect DID Multirate Ctr"). Id. You can also see the separate cost for the channel mileage, noted as "ISP PRI Arrangement" and "ISP/PRI Arrangement W/CPN Only". Id.

[4] Although Comcation has dropped their argument concerning the Doctrine of Equality of Treatment, the fact that the IRS found in favor of the taxpayer in Letter Ruling 2001-33008, clearly demonstrates that even the IRS is unclear on how to apply the "local telephone service" definition when faced with PRI lines purchased by an ISP. That ruling was published in the year 2001 and at that time the IRS had the benefit of all the Revenue Rulings and cases that the Government would have this Court rely on today to reach an alternative decision. Although in no way cited as precedence, this Letter Ruling does support the

1977). In Comcation's Post Trial Brief, Comcation explained at length the ambiguity present in the Government's argument. We would ask that this additional factor be included in the Court's consideration of the ambiguities present in the Government's position. In the present case, the Government points to Revenue Ruling 75-9 in support of their position. DPTB at 6. The IRS, however, came to an alternate conclusion in Revenue Ruling 73-242, as it related to "foreign exchange service" and "private communication service." Compare Rev. Rul. 75-9 to Rev. Rul. 73-242. These Revenue Rulings clearly deal with a similar issue present in this case and, as such, the conflicting Revenue Rulings add an additional factor for the Court's consideration. If the Court finds that the Government's application of the Code is ambiguous, that ambiguity must be interpreted in favor of the Taxpayer.

**B. The Holding in USA Choice supports Comcation's argument that all the PRI lines purchased by Comcation fit within the definition of "private communication service" found in Section 4252(d)(1) and, therefore, are excluded from the definition of "local telephone service" subject to tax under Section 4251 of the Internal Revenue Code.**

"Private communication service" includes within its definition a "communication service furnished to a subscriber which entitles the subscriber – (A) to exclusive or priority use of a communication channel or groups of channels…." §4252(d)(1). In USA Choice the Court was faced with an ISP provider that purchased PRI lines and used them to provide dial up access to their customers. USA Choice Internet Service, Fed Cl. No. 05-525 T

Taxpayer's position that there is reasonable doubt that these lines should be subject to the communication excise tax.

(2005). In USA Choice the Court held that the PRI lines that connected the ISPs network access servers to the central office were "private communication service" because the ISP had "priority use" of the communication channel. Id. at 29. They reasoned "[t]hese were not lines where multiple telephone service subscribers would share the same loop on an equal basis...USA Choice was not required to yield to anyone in its use of these communication channels." Id. The Court also held that USA Choice was the "subscriber" of the lines because "[e]very time a dial-up customer connects to USA Choice over these channels, USA Choice is using the channels to provide a service to its customers." Id. Finally, the Court noted there was a separate charge, where the PRI lines were separately stated on the invoice. Id. at 30 (noting that DCS and BRA, both advance digital service PRI lines, were separately stated on the invoice).

In USA Choice all the network access servers were located in the same local calling area as the local access. See Id. at 3. This fact is the only thing that distinguishes this case from USA Choice. Furthermore, the PRI lines that Comcation purchased for dial up customers in Doylestown, where their network access servers are located, are on all fours with the facts in USA Choice. However, Comcation would also argue that the lines that extend outside of Doylestown have the same qualities as the lines in USA Choice that led the Court to hold they were "private communication services." Specifically, the lines all connect Comcation's network access servers to central offices where their dial up customers call in. Like USA Choice, the PRI lines are only connected to the network access servers and the central office. As such, like the lines in USA Choice, the only use of the lines are customers dialing into Comcation's network access servers. Finally, with the exception of the Bell Atlantic invoices, which fail to provide

detail, all the PRI lines purchased separately state the cost of the PRI lines. Like the lines in USA Choice, Comcation's purchase of PRI lines purchased from TCG, AT&T and XO Communication fit neatly within the statutory exclusion for "private communication services" in §4252(d)(1) because Comcation, as the subscriber, had priority use of those lines.

The Court should find these lines are "private communication service" and, therefore, are excluded from the Federal Excise Tax on "communication services."

**II. The Government's argument that a line that provides incoming only access still provides Comcation with the privilege of access necessary to bring it within the definition of "local telephone service" is without merit.**

The Government next argues that even if the lines in question did not permit outgoing calls, it still would not change the result. DPTB at 7. The Government reasons that if the lines were provisioned for "incoming only" it was Comcation that chose to do so. DPTB at 7-8. They also reasoned that "access" to a local telephone system by itself is enough to bring the service within the definition of "local telephone service." Id. at 11-12.

The Government's first contention is clearly erroneous. The capabilities of the lines actually provided by the telecommunication carrier is the relevant question.[5] See Comdata Network, Inc. v. U.S., 21 Cl.Ct. 128, 130-131 (1990). Specifically, what lines were purchased and what are the capabilities of those lines. The PRI lines purchased by

[5] The Government's contention that the parties stipulated to the fact "that the PRI services were capable of both receiving and initiating calls, regardless of how Comcation chose to configure or use them…the parties have stipulation to as much" is not an accurate characterization of the facts. Stipulation 12 specifically says "the channels provided through a PRI service may be configured to be incoming, outgoing, or two-way, or may be configured on a call-by-call basis." This is a general statement about PRI. **The PRI that Comcation chose to purchase was incoming only. Comcation did not configure the lines. The telephone company sold Comcation lines that were configured for incoming only service.**

Comcation were offered as incoming only by the telephone companies that the lines were purchased from. A logical follow on question is why would such a service be offered? What would the telephone companies' motivation be? Would the line be more efficient, more cost effective? One motivation could be reciprocal compensation. Verizon made this point clear when entering testimony in a matter before the Maryland Public Utility Commission in opposition of AT&T's PrimeConnect tariff.

> "AT&T readily admits that its VNXX offering t**argets customers with heavy inbound calling patterns, allowing it to drive its reciprocal compensation payments as high as possible.** For example, the promotional materials for AT&T PrimeConnect service, which is the marketing name for AT&T's VNXX offering, describes it as a '**predominantly an inbound traffic solution.**'[6] AT&T's website describes PrimeConnect as "[t]he ideal solution for heavy inbound traffic,' and notes that it 'is best suited for handling heavy inbound-only traffic," particularly for enhanced service providers (such as ISPs)." Rebuttal Testimony of Verizon Maryland, Inc., In re: Application of AT&T Communications of Maryland, LLC and TCG Maryland, Docket No. 8882, 27-28 (State of Maryland Public Service Commission, May 16, 2003) (attached as Exhibit 1) (footnote 6 added).

The reciprocal compensation scheme is noted here only to demonstrate one of the motivations a telephone company would have in offering inbound only service. Another

[6] This is consistent with TCG's description of PrimeConnect service. Although not the relevant tariff for the jurisdictions that this matter involves, TCG in their on-line tariff filing with the Washington Utilities and Transportation Commission (WA UTC) states that "PrimeConnect supports inbound calling only, and does not include outbound calls...PrimeConnect is intended solely for the purpose of providing local and intraLata non-toll access into a Customer's location. TCG Seattle, Original Price Sheet 72.1a, effective April 28, 2003, WA UTC (attached hereto as Exhibit 2).

plausible explanation could be that ISP customers have requested it (supply and demand economics), which was clearly the case with Comcation. See R. 73:20-23; R. 50:16; R. 45:21-24. In any case, the PRI lines purchased by Comcation had inherent limitations when the lines were purchased. Comcation did not place the limitations on the lines themselves.

Under the Government's interpretation any line would be taxable because the customer would always have the option of buying lines that have more capabilities, which would in turn bring them within the scope of the tax. The limitations of the PRI lines purchased by Comcation are clear. They could only be used to receive incoming traffic. They could not be used by Comcation to initiate calls. These lines were offered to ISPs specifically for their limited business purpose of allowing customers to dial into their network.

In support of their second assertion – that access by itself is enough to bring the PRI lines with the definition of "local telephone service" - the Government points to Rev. Rul. 77-196. DPTB at 11. Rev. Rul. 77-196 is distinguishable from the present case. In Rev. Rul. 77-196 the Service was faced with a business that had an ACD system that was attached to a local trunk. Rev. Rul. 77-196. There was no indication in the Revenue Ruling that the trunk was provisioned for only incoming calls. Id. Instead, the customer premises equipment, an Automated Call Distributing (ACD) System, only was used to receive incoming calls. Id. The IRS found that the equipment was taxable. Id. Our case is distinguishable. Here we are not arguing that the equipment capabilities, or the use of the line, determine whether an incoming only PRI is within the scope of "local telephone service." Instead, USA Choice is asserting that a line which does not allow outgoing

calls does not meet the definition of "local telephone service." This distinction goes back to the simple principal that both the Government and USA Choice agree with – it is the capability of the line, not the use, which should determine the taxability of the line. The Plaintiff agrees that if the lines in question in the present case allowed the plaintiff to initiate a call using a regular telephone, that service would meet the access requirements and would qualify as local telephone access, unless otherwise excluded as a "private communication service" or because the line did not provide access to Comcation's local exchange. Finally, it is important to point out that Rev Rul. 77-196, decided in 1977, predates the availability of PRI. As such, the adjudicators considering that matter could not have envisioned a PRI line that was provisioned for inward dial only service.

In order to truly understand the scope of "local telephone service" we must examine each word of the definition, not focus on the term "access" only. "Access", "privilege", "with substantially all", "such local calling area", must all be given their plan meaning and must be read in context with each other. When this is done, it is clear that a line that does not give Comcation the privilege to initiate telephone calls with substantially all in their local calling area does not meet the definition. The first Court to review this issue also agrees with this position.

Since the Post Trial Brief submitted by Comcation, the Court has rendered an opinion in USA Choice Internet Service. The facts in that case were identical to the facts in the present case with one exception. See USA Choice, at 2-6. In USA Choice the Court was not faced with lines that crossed the local calling area. See Id. at 2-4. Instead, USA Choice had network access servers in each local calling area, which answered the calls in the individual local calling area. Id. The lines that transported

traffic back from the network access servers in the local calling areas to USA Choice's network aggregation point were not taxed and, therefore, were not part of the claim. See Id. In this case, since PRI lines were all answered in Doylestown, an additional fact scenario is present. However, for the purpose of considering whether a line provisioned for incoming only calls is excluded from the definition of "local telephone service" the facts in the present case and USA Choice are identical. In fact, some of the carriers are also the same. Id. at 7. In USA Choice the Court held that lines that were provisioned for incoming only service did not meet the definition of "local telephone service." USA Choice at 21. The Court stated that the government's argument reached too far and "ignores the statutory language requiring that the privilege of 'communication with' extend to 'substantially all persons having telephone...stations constituting a part of such local telephone system.'" Id. at 19. The Court also pointed out that the word "with" "connotes reciprocity." Id. at 18 (the line must allow both incoming and outgoing calls). Finally, the Court held that there was "no 'communication' in the normal sense of the word," since the transmission of the identification request (username and password) "cannot be considered to be a 'telephonic quality communication'[7] in the ordinary sense of those words." Id. at 21 (footnote added).

This Court should hold that Comcation's purchases are not "local telephone service" and are not subject to the Federal Excise Tax on "communication services."

[7] In this case the parties stipulated that "the PRI service lines at issue in the present matter are of telephonic quality." JS at ¶10. Section 4252 requires a "telephonic quality communication." 26 U.S.C. §4252. To the extent that Comcation referred to this in their Post Trial Brief on page 11, they wish to amend the first sentence of the first full paragraph on page 11 to read "The PRI lines that are the subject matter of this litigation are of telephonic quality." The question of whether or not the lines allow for a "telephonic quality communication," is a question of law – not fact. See USA Choice at 21. As such, this is a matter for the Court to decide. Consistent with USA Choice, Comcation would argue that this configuration does not provide for a "telephonic quality communication."

**III. The Government's argument that even if the lines in question are not "local telephone service" they must be "toll telephone service" is without merit.**

The Government also argues that even if the services at issue are not "local telephone services," they are otherwise "toll telephone service," similar to WATS, taxable under §4252(b)(2). DPTB at 12. In support of their argument they note that the recent line of cases interpreted "toll telephone service" only dealt with "time and distance" long distance taxable under §4252(b)(1), not "toll telephone service" as described in §4252(b)(2). Id. Applying this reasoning, the Government argues that even if the lines are not "local telephone services," they are similar to WATS lines and are, therefore, taxable. Id.

The Government's argument fails for three reasons. First, it remains Comcation's assertion, based on the plain meaning of §4252(d) that the PRI under consideration in this case meets the definition of "private communication service," both because it provides "exclusive or priority use of a communication channel" and/or because it "connects a telephone station located outside a local telephone system area with a central office in such local telephone system." Plaintiff's Post Trial Brief (PPTB), 36-38 (November 13, 2006). Second, it is clear, regardless of the recent line of cases dealing with "time and distance" that the IRS's recent notice applies to all long distance services, including those previously taxed under §4252(b)(2). See Notice 2006-50. This is also discussed in more detail in Comcation's Post Trial Brief. PPTB at 14 & 32. Finally, Comcation is arguing that it is possible for the lines in question to be beyond the scope of both "local telephone service" and "toll telephone service." Specifically, Comcation is arguing that it is possible for the PRI lines to not fit within the definition of "local telephone service,"

either because the PRI lines do not have the characteristics necessary to fulfill the requirements of the Section, or because they are a "private communication service." In addition, it is Comcation's position they are also not "toll telephone service" because they do not meet the definition's requirements, as noted below.

The PRI lines that carry internet traffic from local exchanges outside of Comcation's local exchange in Doylestown to their location in Doylestown do not fit within the definition of §4252(b)(2). Comcation explored this issue at length during the trial with the Government's witness. §4252(b)(2) defines "toll telephone service" to include:

> "(2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an **unlimited number of telephonic communications to** or from all of a substantial portion of the persons having telephone or radio telephone station in a specified area which is **outside the local telephone system area in which the station provided with this service is located.**" 26 U.S.C. §4252(b)(2) (emphasis added).

During the trial, Dr. Hills was questioned on the two relevant portions of the definition. Dr. Hills steadfastly stated that the service was not telephone service outside the local telephone system area in which the station provided with this service was located. R. 97:4-13. Instead he insisted that this service was strictly local access, which was **extended** to Doylestown. R. 123:14-15; R. 127:19-23; R. 133:23-24; 134:1-17. Dr. Hills also testified, that there was no evidence that unlimited calls could be made on the PRI lines for one flat amount. R. 138:9-10, 15-17. In fact, he testified that if outgoing calls

could be made on these lines, normal business lines would require payment of a fee for local calls. R. 138:9-10.

Contrary to the Government's stated rationale, Comcation explored this code section at trial because it is their assertion that a line can be outside the scope of both the "local" and "toll" telephone definitions[8]. In the present case the PRI lines are not taxable because they do not fall within the definition of "local telephone service," since lines which do not allow Comcation to make outgoing calls do not possess the "privilege" of access with "substantially all" necessary to meet the definition's requirements. Even if the lines do, they otherwise meet the definition of "private communication service." Finally, the lines also do not meet the definition of "toll telephone service."

One need only look at the recent line of cases dealing with "toll telephone service," where the government argued that they must be either "toll telephone service" or "local telephone service" to conclude that it is possible for a line to be excluded from both definitions and, thus be nontaxable. See National Railroad Passenger v. United States, 338 F.Supp.2d 22 (C.C.D.C. 2004), affirmed 431 F.3d 374 (D.C.Cir. 2005).

The Court should hold that these lines are not within the scope of "toll telephone service" found in Section 4252(b)(2) and are, therefore not subject to the Federal Excise Tax on "communication services."

CONCLUSION

For all of the above stated reasons, as well as the reasons set forth in the Plaintiff's Pre Trial and Post Trial Briefs, the Plaintiff's purchase of PRI lines, are outside the scope of

[8] Even if they did meet the definition of "toll telephone service," Comcation argues they would no longer be taxable based on IRS Notice 2006-25, dated June 19, 2006.

the Federal Excise Tax on "communication services" found in Section 4251 of the Internal Revenue Code. As such, the Plaintiff prays that the Court will grant their Motion for Summary Judgment, deny the Government's Motion for Summary Judgment, and grant Comcation's requested refund.

Respectfully submitted,

December 13, 2006
Date

s/ Anthony C. Gulotta
Anthony C. Gulotta, Esquire
PA Atty. ID #82081
Anderson & Gulotta, P.C.
1110 North Mountain Road
Harrisburg, PA 17112
(717) 635-7145
Fax (717) 541-5434
tgulotta@fbstax.com
Attorney for Plaintiff

**STATE OF MARYLAND**
**PUBLIC SERVICE COMMISSION**

| | | |
|---|---|---|
| **In re: Application of** | * | |
| | * | |
| **AT&T COMMUNICATIONS OF MARYLAND, L.L.C. and TCG MARYLAND** | * | **Docket No. 8882** |
| | * | |
| | * | |
| | * | |
| | * | |
| The Petition of AT&T Communications of Maryland, Inc. for Arbitration Pursuant to 47 U.S.C. § 252(b) Concerning Interconnection Rates, Terms and Conditions | * | |
| | * | |
| | * | |
| | * | |
| | * | |

**REBUTTAL TESTIMONY OF**
**VERIZON MARYLAND INC.**

David A. Hill
Verizon Maryland Inc.
1 East Pratt Street
8th Floor
Baltimore, MD 21202
(410) 393-7225

Catherine Kane Ronis
Jonathan J. Frankel
Wilmer, Cutler & Pickering
2445 M Street, NW
Washington, DC 20037-1420
(202) 663-6000

**DATE: MAY 16, 2003**

EXHIBIT

## TABLE OF CONTENTS


| | | Pages |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | APPLICABILITY OF THE WIRELINE COMPETITION BUREAU'S VIRGINIA ARBITRATION ORDER (ISSUE 1) | 3 |
| III. | VOICE INFORMATION SERVICES TRAFFIC (ISSUE 2) | 8 |
| IV. | VIRTUAL FOREIGN EXCHANGE ("VNXX") TRAFFIC (ISSUE 3) | 15 |
| V. | RECIPROCAL COMPENSATION AND COMPENSATION FOR INTERNET TRAFFIC (ISSUES 4 AND 5) | 43 |
| VI. | TANDEM SWITCHING RATE (ISSUE 6) | 56 |
| VII. | POINTS OF INTERCONNECTION AND RECIPROCAL COMPENSATION (ISSUES 7 AND 8) | 66 |
| | A. Location of the POI. | 70 |
| | B. AT&T'S Compensation For Terminating Verizon MD'S Traffic From the POI. (Issue 7) | 81 |
| | C. AT&T's Charges for Multiplexing, Cross-Connects, and Other Services. | 83 |
| | D. Additional Terms Limiting Interconnection. | 84 |
| | E. Verizon MD's Tandem Switching Reciprocal Compensation Rate | 85 |
| VIII. | REASONABLE TERMS AND CONDITIONS FOR COLLOCATION OF VERIZON MD'S FACILITIES AT AT&T'S PREMISES AND OTHER FORMS OF VERIZON MD'S INTERCONNECTION (ISSUE 9) | 87 |
| IX. | FIBER MEET ARRANGEMENTS (ISSUE 10) | 92 |
| X. | AT&T'S LACK OF COMMITMENT TO JUST AND REASONABLE RATES (ISSUE 11) | 99 |
| XI. | ACCESS TOLL CONNECTING TRUNKS (ISSUE 15) | 105 |
| XII. | ON-PREMISES WIRING (ISSUE 30) | 111 |
| XIII. | ALTERNATIVE LOOP PRE-QUALIFICATION TOOLS (ISSUE 31.5) | 115 |

A. In addition to being required by law, excluding VNXX calls from reciprocal compensation obligations is the only result that makes sense from a policy perspective. AT&T has admitted that, with its VNXX offering, it is attempting to win customers from Verizon MD by charging them *nothing* for their VNXX number and instead seeking to collect all of its revenue from Verizon MD in the form of reciprocal compensation: AT&T states that it offers this option "at no additional charge to its end users" and that it "sees [this] service offering as a way to differentiate itself from Verizon."[68/] On top of that, Verizon MD loses the toll revenues it would otherwise have received on calls to AT&T's VNXX customers, because AT&T has assigned these customers telephone numbers that disguise their true physical location to Verizon MD switches. Thus, subjecting VNXX calls to reciprocal compensation merely gives AT&T a competitive advantage and enables it to win customers "not on basis of quality and efficiency, but on the basis of [its] ability to shift costs to other carriers."[69/] This is exactly what the FCC sought to prevent in the *ISP Remand Order*.

**Q. HOW DOES AT&T'S STRATEGY OF TARGETING CERTAIN KINDS OF VNXX CUSTOMERS AFFECT THIS PROBLEM?**

A. AT&T readily admits that its VNXX offering targets customers with heavy inbound calling patterns, allowing it to drive its reciprocal compensation payments as high as possible. For example, the promotional materials for AT&T's PrimeConnect service, which is the marketing name for AT&T's VNXX

68/ AT&T Direct Testimony at 47.

69/ *ISP Remand Order* ¶ 4.

offering, describes it as a "predominantly an inbound traffic solution."[70] AT&T's website describes PrimeConnect as "[t]he ideal solution for heavy inbound traffic," and notes that it "is best suited for handling heavy inbound-only traffic," particularly for enhanced service providers (such as ISPs).[71]

**Q. IS AT&T PROPOSING TO TREAT VNXX TRAFFIC CONSISTENT WITH OTHER FORMS OF TOLL-FREE INBOUND CALLING?**

A. No. In every respect relevant to this issue, VNXX service functions just like 1-800 service. Both services provide customers with a way to enable people to make what would otherwise be toll calls to them for free; the only difference is the type of toll-free number the customer receives.

A comparison of AT&T's VNXX proposal to the compensation rules that govern 1-800 calling demonstrates just how inequitable AT&T's proposal is. 1-800 service operates just like ordinary long-distance calling except that the called party pays the toll charges on all of the incoming long-distance calls instead of the calling party. If a Verizon MD customer calls an AT&T 1-800 customer, AT&T would pay access charges to Verizon MD for the portion of the call that crossed Verizon MD's network and would in turn charge its customer (the called party) per-minute toll charges and perhaps a monthly service charge as well. Simply by trading the customer's 1-800 number for a VNXX, though, AT&T can enable its customer to escape having to pay *anything* beyond the cost of its phone line for its inbound toll-free calling; instead, AT&T will collect reciprocal compensation

---

70/ AT&T Responses to Verizon MD's First Set of Data Requests, No. 8 (attached at Exhibit C).

71/ http://www.business.att.com/products/productdetails.jsp?productId=prime_connect (visited May 13, 2003). This promotional material is attached as Exhibit A to this testimony.

(N)

4.0 TCG NETWORK SERVICES (Cont'd.)

1. PrimeXpress Network Service (Cont'd.)

PrimeConnect High Volume Inbound Calling Option- PrimeConnect (Cont'd.)

The Customer is required to subscribe to a sufficient number of DS1 trunks at a maximum usage of 400,000 MOU so as to not degrade the TCG network below an incoming call completion rate of 99%. The call completion rate is based on an average of the busy hours occurring during the Customer's busiest hours during the billing cycle. Once the service has been established, the Company may require the Customer to increase the number of PrimeConnect trunks to satisfy the call completion criteria listed above.

A) PrimeConnect Customer Access requirements:

PrimeConnect supports inbound calling only, and does not include outbound calls to Operator Assisted Services, Special Service Codes, Special Access Codes or Carrier Access Codes. The Customer is responsible for securing individual business lines, or other appropriate facilities, to access these services and/or codes, including:

- Conference Calls,
- Calls to Special Service Codes including 500, 700, 900, 976, N11 (where N=2-9) or other special service codes that may be created, or
- Calls to 0 and 00 (N)

(M) (C)

PrimeConnect is intended solely for the purposes of providing local and intraLATA non-toll access into a Customer's location. In the event that local and intraLATA toll calls placed into or out of the PrimeConnect facility become subject to additional charges imposed by connecting carriers or by regulation, the Company reserves the right to modify the facility rate charges for traffic into the location upon 30 days written notice to the Customer. The Customer has the option to accept the rate changes(s) of terminate the contract without penalty, unless specifically bound to specific commitments associated with capital recovery, special construction, or other issues written into the Customer's contract or agreement with the Company over and above the normal terms and conditions of the contract or agreement. (C) (M)

**(M) Material moved from Price Sheet 72.1**



EXHIBIT
tabbies
2