**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 05-515 T**
**(Judge Allegra)**

COMCATION, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

DEFENDANT'S POST-TRIAL REPLY BRIEF

EILEEN J.O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
G. ROBSON STEWART
JACOB E. CHRISTENSEN
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-0878

## Table of Contents

Page

Introduction. . . . . 1

Argument. . . . . 2

I. Comcation's PRI service lines constitute taxable local telephone service.. . . . . . . 2

A. Deference should be given to the Revenue Rulings that apply the definition of local telephone service. . . . . 2

B. The PRI services that provided Comcation with access to local exchanges outside of Doylestown are taxable local telephone service. . . . 5

C. Neither the Internet Tax Freedom Act nor the fact that PRI technology may have been developed after the enactment of the statute in 1965 supports Comcation's arguments. . . . . 7

II. Comcation's PRI service lines do not fall within the definition of private communication service. . . . . 9

A. Comcation's PRI services are not described in § 4252(d)(I)(A). . . . . . . . 10

B. Comcation's PRI services are not described in § 4252(d)(3). . . . . . . . . . 14

III. The decision in *USA Choice* was legally erroneous and is factually distinguishable from this case. . . . . 16

A. The *USA Choice* court erroneously held that the PRI services at issue in that case did not constitute local telephone service under § 4252(a)(1). . . . . 16

B. The *USA Choice* court erroneously held that the PRI services at issue in that case constituted private communication service within the meaning of § 4252(d)(1)(A). . . . . 21

Conclusion. . . . . 25

Appendix. . . . . A-1

# Table of Authorities

**Cases:** **Page**

*Ammex, Inc. v. United States,* 367 F.3d 530 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005). . . . . . 5

*Atlantic Mut. Ins. Co. v. Commissioner,* 523 U.S. 382 (1998). . . . . . 3

*Barnhart v. Walton*, 535 U.S. 212 (2002). . . . . . 4

*Beecham v. United States*, 511 U.S. 368 (1994). . . . . . 6

*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). . . . . . 3

*Colautti v. Franklin*, 439 U.S. 379 (1979). . . . . . 7

*Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990). . . . . . 16, 18, 19

*Cottage Sav. Ass'n v. Commissioner*, 499 U.S. 554 (1991). . . . . . 4

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). . . 6

*McCarthy v. Bronson*, 500 U.S. 136 (1991). . . . . . 6

*Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979). . . . . . 4

*OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2006) . . . . . . 17

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). . . . . . 4

*Smith v. United States*, 508 U.S. 223 (1993). . . . . . 6

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001). . . . . . 7

**Page**

**(Cases continued):**

*USA Choice v. United States*, Fed. Cl. No. 05-525,
2006 WL 3333782 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 18- 21, 24

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001). . . . . . . . . . . . . . . . 4

*United States v. Correll*, 389 U.S. 299 (1967).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Mead Corp.*, 533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Western Elec. Co., Inc. v. United States*, 564 F.2d 53 (Ct. Cl. 1977). . . . . . . . . . . . . . . 9, 13

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 4251.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 4252.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

§ 4254.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

§ 6662.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

§ 7805.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tax and Trade Relief Extension Act of 1998, Pub. L. No. 105-277,
112 Stat. 2681 (1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Miscellaneous:**

Revenue Rulings:

75-9, 1975-1 C.B. 348. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

75-102, 1975 C.B. 351.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

77-196, 1977-1 C.B. 343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

**Page**

**Miscellaneous (continued):**

77-348, 1977-2 C.B. 377. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

78-437, 1978-2 C.B. 266. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

79-245, 1979-2 C.B. 380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

89-84, 1989-1 C.B. 296. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

H.R. Rep. No. 89-433, *reprinted in* 1965 U.S.C.C.A.N. 1645. . . . . . . . . . . 6, 9, 10, 13, 17

S. Rep No. 89-324 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1690 . . . . . . . . 6, 9, 10, 12, 18

Staff of the Joint Comm. on Taxation, Cong., *Options to Improve Tax Compliance and Reform Tax Expenditures* 368 n.821 (Comm. Print. Jan. 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Newton's Telecom Dictionary* (17th ed. 2001). . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 23, 24

Notice 2006-50, 2006-25 I.R.B. 1141. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Silverberg, Kenneth H. and Foster, Mark M., *Internet Tax Freedom Act: Will it be a Success or a Failure*, J. Multistate Tax'n, July, 1999. . . . . . . . . . . . . . 8

*Telecomm.-Glossary of Telecomm. Terms* (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

T.D.O. No. 111-2, 1981-1 C.B. 698 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Treasury Regulations (26 C.F. R.):

§ 1.6662-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

§ 601.601. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-515 T
(Judge Allegra)

COMCATION, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

DEFENDANT'S POST-TRIAL REPLY BRIEF

The United States submits its post-trial reply brief pursuant to the Court's order of September 28, 2006 and in response to Comcation's post-trial brief.

INTRODUCTION

In its post-trial brief, Comcation argues that its PRI services are not taxable local telephone service under § 4252(a) because (1) the services allowed incoming calls only, (2) the services provided access to local exchanges other than the Doylestown local exchange, and (3) the services constitute private communication service. For the reasons stated below, Comcation's PRI services are taxable as local telephone service, as defined in § 4252(a).

ARGUMENT

Comcation's PRI services are taxable local telephone service under § 4252(a) because they provided it with access to a local telephone system and the necessary privilege of communication that is required under the statute. They are not described in § 4252(d)'s exemption for private communication service. The court's decision in *USA Choice v. United States*, Fed. Cl. No. 05-525 T (November 15, 2006), which holds in favor of the taxpayer on similar issues as those presented in this case, is erroneous.

I. Comcation's PRI service lines constitute taxable local telephone service.

Several revenue rulings hold that a service that provides incoming-only access to a local telephone system is taxable under the definition of § 4252(a). Those rulings are entitled to deference by the Court. Similarly, the structure of § 4252 reflects Congress' intent to include services that provide local access to distant local exchanges within the definition of local telephone service. Neither the Internet Tax Freedom Act nor the fact that PRI technology may have been developed after the enactment of § 4252 in its current form supports a conclusion to the contrary, and Notice 2006-50, 2006-25 I.R.B. 1141, simply does not apply to the issues of this case.[1]

A. Deference should be given to the Revenue Rulings that apply the definition of local telephone service.

Several long-standing revenue rulings that we cited in our pre-trial brief support the plain meaning of § 4252(a) that a service providing any access (incoming, outgoing, or both) to the

[1]Notice 2006-50 was addressed in the Government's post-trial brief, and will not be revisited here.

local telephone system is taxable under the definition of § 4252(a).[2] As we explained in our pre-trial brief, the descriptions of the services at issue in Revenue Rulings 75-102, 1975 C.B. 351 ('time-of-day' and 'weather forecast' announcements) and 89-84, 1989-1 C.B. 296 ('public announcement service') are clear that they did not allow the businesses that subscribed to them to initiate calls. Nevertheless, the rulings hold that the services provided access to the local telephone system and the privilege of telephonic quality communication with substantially all persons having a telephone constituting part of the local telephone system, because they allowed the subscribing businesses to make advertisements and otherwise communicate a message or information to anyone who placed a call using the local telephone system. Revenue Ruling 77-196, 1977-1 C.B. 343, squarely addresses the issue of whether a service that is capable of receiving only incoming calls is subject to the excise tax, and holds that an incoming-only service is taxable.[3] The Court should give deference to these rulings.

Arguably, revenue rulings are entitled to *Chevron* deference by the Court, which accords to such rulings the "force of law."[4] *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*,

---

[2]It is difficult to imagine a broader term than "access" that Congress could have used to define local telephone service. The Joint Committee on Taxation noted that "[t]he access to substantially all persons having telephone stations constituting a part of the local system is *sometimes referred to as access to the public switched telephone network.*" Staff of the Joint Comm. on Taxation, Cong., *Options to Improve Tax Compliance and Reform Tax Expenditures* 368 n.821 (Comm. Print. Jan. 27, 2005) (emphasis added).

[3]The foregoing revenue rulings may be contrasted with Revenue Ruling 77-348, 1977-2 C.B. 377, where the Commissioner held that a telephone-operated security system that provided access to, and the privilege of communication with, only a limited number of telephone stations did not constitute local telephone service under § 4252(a).

[4]Unlike Treasury Regulations, which the Supreme Court has already ruled are entitled to *Chevron* deference (*Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382, 387-389 (1998)), revenue rulings are not subject to notice and comment. The Supreme Court has made it clear, however, that while notice-and-comment rulemaking and formal adjudication almost always

467 U.S. 837 (1984). However, even before *Chevron*, the Supreme Court held that the Commissioner's rulings were entitled to deference, especially where they were consistently applied over a lengthy period of time. *United States v. Correll*, 389 U.S. 299, 306-307 (1967); *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 483-484 nn.16-19 (1979); *see Cottage Sav. Ass'n v. Commissioner*, 499 U.S. 554, 563 n.7 (1991); *see also United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (revenue rulings "attract[] substantial judicial deference" where they reflect the Commissioner's longstanding interpretation of his own regulations). As the Court in *Mead* observed, under the decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's

---

assure *Chevron* deference, the absence of such formalities does not preclude such deference, so long as it appears that Congress intended to grant the agency the power to make rules with the "force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-227, 230-231 (2001); *see also Barnhart v. Walton*, 535 U.S. 212, 221-222 (2002) (according *Chevron* deference to a "longstanding" agency interpretation reached through "means less formal than 'notice and comment' rulemaking"). Revenue rulings satisfy this standard.

The IRS promulgates revenue rulings pursuant to its statutory authority to "prescribe all needful rules and regulations for the enforcement of" the Code. I.R.C. § 7805(a); Treas. Order 111-2, 1981-1 C.B. 698, 699. Revenue rulings are formal interpretative rulings involving "substantive tax law." Treas. Reg. § 601.601(d)(2)(v)(a). They are issued by the IRS National Office and published in the Internal Revenue Bulletin as the agency's "official" position to guide taxpayers and IRS officials alike. Treas. Reg. § 601.601(d)(2)(i)(a). Both rulings and regulations are written and reviewed at the same levels of the IRS and the Treasury Department. Treas. Order 111-2, *supra*. Like regulations, revenue rulings have legal force and effect in that they constitute "precedents to be used in the disposition of other cases" that "may be cited and relied upon for that purpose." Treas. Reg. § 601.601(d)(2)(v)(d). A taxpayer's disregard of applicable revenue rulings can result in the imposition of penalties. I.R.C. § 6662; Treas. Reg. § 1.6662-3(b)(2).

position." *United States v. Mead Corp.*, 533 U.S. 218, 226-227, 228 (2001). Even if revenue rulings are not controlling precedent, they are certainly highly persuasive precedent that should be followed unless unreasonable. *See Ammex, Inc. v. United States*, 367 F.3d 530, 534-535 (6th Cir. 2004)*, cert. denied*, 544 U.S. 948 (2005).

Here, at least three revenue rulings, in force for at least 25 years, have applied the excise tax to local telephone services that did not allow outgoing calls. The Commissioner specifically addressed the issue in 1977 in Revenue Ruling 77-196. These rulings express the Commissioner's longstanding interpretation of § 4252(a), they are entirely reasonable, and they are consistent with the plain language of the statute. Therefore, they merit deference by the Court.

B. The PRI services that provided Comcation with access to local exchanges outside of Doylestown are taxable local telephone service.

Under the plain language of the statute, a service that provides customers with access to *a* local telephone system other than that geographically located nearest the customer constitutes local telephone service if it provides the privilege of telephonic quality communication with substantially all persons having a telephone within *such* local telephone system. In this respect, Comcation's PRI services are analogous to so-called "foreign exchange service," which the Commissioner has already held to be taxable local telephone service. Revenue Ruling 75-9, 1975-1 C.B. 348.

In addition to the language of the statute and the Commissioner's holding, the structure of § 4252 as a whole reflects Congress' intent to include foreign exchange services within § 4252(a)'s definition of local telephone service. When construing a statute, the court must look to the particular statutory language at issue, as well as the "language and design of the statute as a

whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991); *accord Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must ... interpret [a] statute 'as a symmetrical and coherent ... scheme' and 'fit, if possible, all parts into an harmonious whole'"); *Beecham v. United States*, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences"); *Smith v. United States*, 508 U.S. 223, 233 (1993) ("Statutory construction . . . is a holistic endeavor").

Section 4252(d)(3) excludes from the definition of local telephone service the "channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system ...[if] a separate charge is made for [the mileage]." Foreign exchange service is the prototypical example of a service that invokes application of this subsection.[5] On its face, subsection (d)(3) applies to the external wire used in foreign exchange services to connect a telephone station over some distance to a central office which is outside the subscriber's exchange area. Thus, while the foreign exchange service itself is subject to tax as local telephone service under § 4252(a) because it provides access to a local exchange, the amount paid for mileage to extend the physical wire between the station and that local exchange is excluded from the excise tax under § 4252(d)(3), if it is separately charged (which it was not, in this case). Taken together, it is clear that §§ 4252(a) and 4252(d)(3) were designed to accomplish this result.

---

[5]The legislative history provides little guidance on the purpose of the channel mileage exclusion in 4252(d)(3), other than to note that it is "included" in the definition of private communication service. H.R. Rep. No. 89-433, *reprinted in* 1965 U.S.C.C.A.N. 1645, 1678; S. Rep. No. 89-324, *reprinted in* 1965 U.S.C.C.A.N. 1690, 1726.

Additionally, the exemption for channel mileage in § 4252(d)(3) shows that, as an initial matter, foreign exchange service falls within the scope of § 4252(a). Otherwise, there would be no need for the channel mileage exemption. *See Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (relying on the "elementary cannon of construction that a statute should be interpreted so as not to render one part inoperative"); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principal of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'"). Thus, Comcation's PRI services that were provided by remote local exchanges fall within the taxable purview of § 4252(a).

C. Neither the Internet Tax Freedom Act nor the fact that PRI technology may have been developed after the enactment of the statute in 1965 supports Comcation's arguments.

Finally, neither the Internet Tax Freedom Act nor the fact that PRI technology was likely developed after the enactment of the statute in 1965 supports Comcation's contention that its services are beyond the scope of § 4252(a). Comcation correctly notes that the Internal Revenue Code does not currently impose a federal tax on the business of providing Internet access. However, ISPs providing Internet access by using telecommunication services are responsible for the taxes imposed on the underlying telecommunications services under §§ 4252 through 4254. The Internet Tax Freedom Act places a temporary moratorium on taxes imposed by *States* and their political subdivisions on "Internet Access," but does not apply to federal taxation. Pub. Law No. 105-277, Div. C, Title XI, §§ 1100 to 1104, 112 Stat. 2681-719 (1998) (current version at 47 U.S.C. § 151 note). At any rate, the moratorium did not apply to taxes imposed on the

underlying communication services, because they were excluded from the definition of "Internet Access" during the time Comcation purchased the services at issue.[6] *Id.* at § 1104(5), (9) (1998).

While PRI technology may have been developed after 1965, that does not mean that it is beyond the scope of the excise tax. PRI is a digital service that provides the same service capability as 23 separate traditional copper-wire single-line voice circuits, but more efficiently, and usually at less cost. (Tr. at 93:7-94:13; *see also* definitions of PRI, ISDN, and T-1, Def. Ex. 1 at A-2 through A-4.; App. A-9, A-14, A-17.) PRI service can be used for a variety of purposes, including regular voice communication, networking, and voice processing systems, *i.e.*, PBX systems.[7] *Ibid.*; *see also Newton's Telecom Dictionary* 373-5, 548 (17th ed. 2001), App. at A-9 through A-11, A-14. Accordingly, while PRI services are technological improvements to the electro-mechanical telecommunication technology they replaced, they do not represent "new" telecommunication services. Rather, PRI services replaced previous technology (copper-wire single line voice circuits) that was used to provide access to local and long distance services with technology that was more efficient and cheaper, but which still provide the same access to local and long distance services described in § 4252. The underlying technology used to deliver a telecommunication service is immaterial to the incidence of the telecommunications excise tax as long as the service itself satisfies the terms of the statute. While PRI technology may not have

[6] "The term 'Internet access' . . . does not include telecommunications services." IFTA § 1104(5) (1998). "'[T]elecommunications service' . . . includes communications services (as defined in section 4251 of the [Code]." *Id.* at § 1104(9). As noted by commentators, "[t]he exclusion of 'telecommunications' is based on the ITFA's fundamental premise that Internet access services are separate from the underlying telecommunications infrastructure on which they currently depend." Kenneth H. Silverberg and Mark M. Foster, *Internet Tax Freedom Act: Will it be a Success or a Failure*, J. Multistate Tax'n, July, 1999, at 2.

[7] A PBX (private branch exchange) is a small version of the phone company's larger central switching office, but it is privately owned. *Newton's* at 518, App. at A-13.

existed in 1965, local telephone service, as used by Comcation to provide its customers access to the Internet, did exist in 1965 and is defined in § 4252(a).

II. Comcation's PRI service lines do not fall within the definition of private communication service.

Local telephone service does not include private communication service, as defined in § 4252(d). Comcation argues that its PRI services constitute private communication service under § 4252(d)(1)(A) or, alternatively, under § 4252(d)(3).

The exemption for private communication service was added to the statute primarily to equalize the tax treatment of different types of "intrapremise" communication services. Prior to 1965, private communications systems such as private lines (described in § 4252(d)(1)(A)) and intercommunication systems (described in § 4252(d)(1)(B)) set up for single subscribers were taxed as "general telephone service" if they could access the local exchange system. However, where similar services were performed with private equipment, such services escaped taxation, putting the telephone companies at a severe competitive disadvantage. H.R. Rep. No. 89-433, *reprinted in* 1965 U.S.C.C.A.N. 1645, 1677; S. Rep. No. 89-324, *reprinted in* 1965 U.S.C.C.A.N. 1690, 1726. Thus, the exemption provided that certain communication services would not be subject to tax, "regardless of whether [they] may be connected through switching with a service described in (a) [local telephone service], (b) [toll telephone service], or (c) [teletypewriter exchange service]." The immediate effect was to eliminate the tax on "private communication service" when the service was provided by telephone companies in connection with their regular telephone service. *Western Elec. Co., Inc. v. United States*, 564 F.2d 53, 57 (Ct. Cl. 1977). The legislative history indicates the type of service to which the provision was intended to apply:

> The definition of a private communication service refers to a communication service where a subscriber is entitled to the exclusive or priority use of a communication channel or groups of channels. This is sometimes referred to as a private line. The reference to an intercommunications system is intended to refer to a private exchange system for a single subscriber and thus to cover private PBX systems (whether or not they have in-dialing). Included in the definition of a private communication system is channel mileage for communication between a telephone station located outside a local exchange system and a central office in such local telephone system, if a separate charge is made for this service.

H.R. Rep. No. 89-433, *reprinted in* 1965 U.S.C.C.A.N. 1645, 1677-78; S. Rep. No. 89-324, *reprinted in* 1965 U.S.C.C.A.N. 1690, 1726. To be exempt, a separate charge for the private communication service is necessary, apart from charges for local, toll, or teletypewriter exchange service. I.R.C. § 4252(d). None of Comcation's PRI services satisfy the definitional requirements of § 4252(d).

A. Comcation's PRI services are not described in § 4252(d)(1)(A).

Comcation's services are not described in § 4252(d)(1)(A), because they did not entitle Comcation to the exclusive or priority use of a communication channel or groups of channels within the meaning of the statute. As noted above in the legislative history, services that fall under § 4252(d)(1)(A) are sometimes referred to as "private lines." *Newton's Telecom Dictionary* contains the following definition for "private line":

> A direct circuit or channel specifically dedicated to the use of an end user organization for the purpose of directly connecting two or more sites in a multisite enterprise. . . . Private lines are leased from one or more carriers . . . [and] provide connectivity on a non-switched basis. As they bypass the network switches, private lines use the various switching centers (e.g., Central Offices . . .) only as wire centers for the interconnection of circuits.

*Newton's* at 549, App. at A-15. The *Telecommunications Glossary* defines "private line" as follows:

> In the telephone industry usage, a service that involves dedicated circuits, private switching arrangements, and/or predefined transmission paths, whether virtual or physical, which provide communications between specific locations. *Note*: Among subscribers to the public switched telephone network(s), the term *"private line"* is often used to mean a one-party switched access line.[8]

*Telecomm., Glossary of Telecomm. Terms* P-23 (1997), App. at A-5. A typical example of a private line would be a line that provides exclusive telephone service between a hospital and a nearby medical center, which allows them to communicate without the aid of public switching services.

The Senate Report of the Excise Tax Reduction Act of 1965 contains a useful example of a private line, within the meaning of § 4252(d)(1)(A).[9] While the bill was being reviewed, questions arose regarding the application of the exemption to certain answering services that would answer a call for a subscriber when he was not at home. Based on the description of the service, a separate line connected the subscriber's telephone station to the answering service, which was usable only for answering the subscriber's telephone. Incoming calls would be switched over to the answering service on the separate line, and a signal would flash on a board to indicate to the answering service the presence of an incoming call. On these facts, the Senate Report concludes that the line connecting the subscriber's station to the answering service would

---

[8]This last sense of the term "private line," meaning a one-party switched access line (as opposed to a party line, where multiple users share the same line), is obviously not the meaning Congress intended to associate with the statute. Otherwise, the communication excise tax would have been inapplicable to most home and business owners' regular telephone service at the time of the statute's enactment.

[9]Although the report does not explicitly state that the cited example refers to paragraph (d)(1)(A), that conclusion is supported by the reasoning contained in the report: the answering service "is usable only for answering the subscriber's telephone." Furthermore, the example is not described in paragraph (d)(1)(B), which applies to the use of an intercommunication system for the *subscriber's* stations, which would not include the outside answering service described in the example.

be exempt from tax as a private communication service. S. Rep. 89-324, *reprinted in* 1965 U.S.C.C.A.N. 1690, 1726-27.

The answering service described in the Senate Report entitles its subscriber to the exclusive or priority use of a channel or groups of channels, *i.e.*, the line running from the subscriber's station to the answering service, within the meaning of § 4252(d)(1)(A). This is true even though the private line to the answering service is "connected through switching with a service described in subsection (a) [local telephone service]"; namely, the line running from the telephone company to the subscriber's telephone station, providing it with regular telephone service. As the quoted portion of the exemption suggests, the service provided through the line to the telephone company is *described in subsection (a)* and would be subject to tax as local telephone service because it provides the subscriber with access to a local exchange and the privilege of communication with substantially all stations within it.

Here, Comcation's PRI services provided its private network with regular telephone service in the same way as the line running from the telephone company to the subscriber's telephone in the Senate Report example. They do not constitute private lines for the dedicated use of Comcation any more than the line that provides an ordinary homeowner with local telephone service.

When Congress created the exemption for private communication service, it did not intend to include within it local telephone service provided in connection with a private line or intercommunication system. This is evident in the initial disparate treatment under the exemption of the PBX and Centrex systems. These systems generally consisted of switching equipment, including telephone stations and connecting lines, that provided private intercommunication between the subscriber's stations. Additionally, these intercom systems

were usually "connected through switching" to the local telephone system through trunk lines that connected them to the local exchange, providing them with regular telephone service. These lines permitted the intercom stations to make and receive outside calls, either directly or with the aid of an attendant. *See Western Elec.*, 564 F.2d at 56 (describing the Centrex and PBX systems).

The legislative history is clear that the reason the so-called Centrex system would not immediately qualify under the exemption was because its providers did not at that time separately bill the taxable regular telephone service from the otherwise exempt intercom system: "However, it is understood that Centrex systems . . . generally do not, as yet, provide for a charge which is separate and distinct from that for local telephone service. Until such a separation is made, this exemption, therefore, will not apply in the case of Centrex service." H.R. Rep. 89-433, *reprinted in* 1965 U.S.C.C.A.N. 1645, 1677. In the case of a PBX, the intercom system was generally charged separately from any associated local telephone service; therefore, the charge for the intercom system itself was exempted from tax, even though it was connected through switching[10] to a local service, *i.e.*, the service provided through the trunk lines running to the local exchange. Therefore, while the service for a private line or for an intercom system may be exempt from tax, if it is separately charged, any associated local, toll, or teletypewriter service that is connected through switching to one of those services is not exempt.

Comcation's network, including its PRI service lines, is analogous to an intercom system where, while the basic intercommunication system is an exempt private communication service if separately charged, the regular telephone service provided in connection with it is subject to tax.

---

[10]In the PBX case, the switching was performed with private switching equipment by an attendant located on the customer's premises.

Comcation's private network, consisting of network access servers, an authentication server, and connecting lines, is similar to the tax-exempt intercom system. On the other hand, the PRI services are analogous to the trunk lines that connect an intercom system to a local exchange, providing it with taxable, regular telephone service.

Similarly, Comcation's PRI services are analogous to the taxable central office lines described in Revenue Ruling 78-437, 1978-2 C.B. 266, which Comcation agrees is "on point." Pl. Br. at 37. In that Ruling, a telephone company provided services similar to a small PBX system. Included in the service were telephone stations located on a customer's premises, certain equipment necessary for making calls among those stations, and central office lines connecting the system to the local exchange. Each telephone station had the capability of intercommunication with every other station. Additionally, each station had direct access to the central office lines, enabling them to receive incoming calls and make outgoing calls directly, without attendant assistance. The Ruling concludes that the system, in addition to providing private communication between the stations, provided direct access from each station to local telephone service within the meaning of § 4252(a). Thus, while the separate charge for the intercommunication equipment, including the stations, was exempt from tax, the charge for the central office lines was taxable local telephone service, because the lines gave access to a local telephone system. Similarly, the PRI service lines at issue give Comcation's network access to a local telephone system, and were not intended by Congress to be included in the definition of private communication service.

B. Comcation's PRI services are not described in § 4252(d)(3).

Also included in the definition of private communication service is the channel mileage to connect a telephone station located outside a local telephone system area with a central office

in such local telephone system, if it is separately charged. Although § 4252(d)(3) would otherwise apply to a charge for the "channel mileage" to extend Comcation's PRI lines to local exchanges beyond Doylestown, here it does not, because Comcation was not separately charged for the channel mileage extensions.

In Revenue Ruling 75-9, 1975-1 C.B. 348, a radio station purchased foreign exchange service to enable listeners in an area outside the local exchange area of the radio station to call in using a local number. The telephone company providing the service made two charges for the service: one for the channel mileage to the foreign exchange area, and another for the local service furnished within the foreign exchange area. The Commissioner held that the charge for the channel mileage furnished to connect the radio station with the local service in the foreign exchange area was a private communication service, defined in § 4252(d)(3), because it was charged separately from the local service.

Unlike the separate charge for channel mileage in Revenue Ruling 75-9, Comcation's providers did not separately bill it for channel mileage, apart from the PRI service. Comcation's witness testified that the charge for its Bell Atlantic (later Verizon) services included a distance component, which was based on the distance between each remote central office and Doylestown. (Tr. at 43:23-44:9.) However, the Bell Atlantic invoices do not include a separate charge for this distance component (Pl. Ex. 4 at 1-559) which would have varied for each of the PRI service lines provided by Bell Atlantic (Tr. at 44:10-21). Similarly, the TCG /AT&T invoices reflect no channel mileage charges. (Pl. Ex. 4 at 562-615.) And the pricing for services from XO was not affected by distance, based on Comcation's testimony and on the invoices. (Tr. at 61:21-23; Pl. Ex. 4 at 616-31.) Therefore, § 4252(d)(3) does not exclude from tax any portion of the charge for any of Comcation's PRI services.

III. The decision in *USA Choice* was legally erroneous and is factually distinguishable from this case.

Since the parties filed their post-trial briefs, the court in *USA Choice v. United States*, Fed. Cl. No. 05-525 T, 2006 WL 3333782 (November 15, 2006), reached a decision in favor of the taxpayer on some issues similar to those presented in this case. For the reasons stated below, the *USA Choice* court's decision was legally erroneous and is factually distinguishable from this case.

A. The *USA Choice* court erroneously held that the PRI services at issue in that case did not constitute local telephone service under § 4252(a)(1).

The *USA Choice* court erroneously construed the language of the statute to require that a service be capable of both receiving and initiating calls to be taxable under § 4252(a). The court improperly distinguished one long-standing revenue ruling and failed to address others which hold that "incoming only" access is taxable under § 4252(a). As previously discussed, these revenue rulings should have been given deference by the court. Additionally, the court failed to apply the principles set forth in *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990), that the privilege, and not a taxpayer's actual use of the telephone service, governs taxability under the excise tax statute.

In holding that § 4252(a) applies only to local telephone service that is capable of both initiating and receiving calls, the *USA Choice* court attempted to differentiate the statute's use of the word "with," in defining local telephone service under § 4252(a)(1), with the use of the term "to or from," in defining toll telephone service under § 4252 (b)(2). Opinion at 17-18. Specifically, § 4252(a)(1) defines local telephone service as "the access to a local telephone system, and the privilege of telephonic quality communication *with* substantially all persons . . . [in the] local telephone system." Section 4252(b)(2), provides that toll telephone service means

"a service which entitles the subscriber . . . to the privilege of an unlimited number of telephonic communications *to or from* all or a substantial portion of the persons having telephone or radio telephone stations in a specified area . . . ." The court's reliance on this purported distinction, however, is grammatically incorrect and misapprehends the services described in the statute.

The court's finding that § 4252(a)(1) uses "with" to connote "reciprocity," whereas § 4252(b)(2) uses "to or from" to connote "single direction communication," is grammatically incorrect when the complete wording of the statute is examined. In quoting § 4252(b)(2), the court omitted a vital portion of the statute. Specifically, the court stated that § 4252(b)(2) uses the language of "privilege of . . . communications to or from all or a substantial portion of the persons having telephone . . . stations. Opinion at 17. However, the full phrase is a "privilege of *an unlimited number of telephonic communications* to or from all or a substantial portion of the persons having telephone or radio telephone stations . . . ." Thus, it is clear that the word "with" in § 4252(a)(1) and the phrase "to or from" in § 4252(b)(2) arise in two distinct grammatical contexts, which is the reason Congress did not use the same phrase in both subsections. "With" in subsection (a)(1) modifies "communication," which occurs after a call is established. Joining "communication" and "with" is the natural and common grammatical usage in this situation. On the other hand, "to or from" in subsection (b)(2) refers to an "unlimited number of telephonic communications" or *calls*. Unlike *communication*, which occurs after a call is connected, *calls* themselves are directional by nature and invoke the use of a phrase like "to or from."

This conclusion is bolstered by examining the service described in § 4252(b)(2). Congress used the phrase "to or from" in § 4252(b)(2) to include within its scope AT&T's INWATS and OUTWATS services. *OfficeMax, Inc. v. United States*, 428 F.3d 583, 599 (6th Cir. 2006); H.R. Rep. No. 89-433, at 30 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1645, 1677; S.

Rep. No. 89-324, at 35 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1690, 1725. The OUTWATS only allowed calls "to" a specified area, and the INWATS only allowed calls "from" a specified area. *See Comdata*, 21 Cl. Ct. at 129-30. Hence, the use of the phrase "to or from" was intended to ensure that both types of *calls* were encompassed within the definition. Left unsaid, due to obviousness, is that once those calls were established, the callers could communicate "with" the distant telephone stations. Accordingly, the *USA Choice* court's misplaced reliance on a distinction between the use of "with" and "to or from" does not support its conclusion that incoming-only local telephone service is not taxable.

Moreover, *USA Choice's* holding that an incoming-only service is not taxable under § 4252(a) is based on a faulty interpretation of Revenue Ruling 77-196. In that Ruling, the Commissioner held that certain automatic call distributing systems were taxable, even though they were designed to handle only incoming calls. In support of its holding, the Ruling cites to Revenue Ruling 75-102 and notes that the time-of-day and weather-forecast services there were similarly capable of receiving incoming calls only. In distinguishing Revenue Ruling 77-196, the court created a two-pronged test, *i.e.*, an "access" portion and a "privilege" portion of the definition of local telephone service. The court then proceeded to attribute the Ruling's reasoning to the "access" portion only, concluding that no consideration was given by the Ruling to the "privilege" portion of the definition. Opinion at 19. However, there is nothing in the Ruling to support the conclusion that the Ruling applies only to the "access" portion of the definition. Rather, the Ruling's statement of the issue is "whether the fact that an ACD system is capable of receiving only incoming calls makes a difference in determining the tax consequences for that system." The Ruling explains that "[i]n defining *taxable local telephone service*, section

*4252(a)(1)* makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls" (emphasis added).

In addition, the *USA Choice* decision did not address either Revenue Ruling 75-102 or 89-84, which were cited to the court. Revenue Ruling 75-102 involved a time-of-day and weather-forecast service that could be purchased by businesses to advertise to callers using the service. Callers would hear an automatic, tape-recording of the pertinent information as well as an advertisement from subscribing businesses. Based on the Ruling's description of the service, it is clear that it was designed only to receive incoming calls and that a subscribing business could not use the service to initiate outgoing calls. The Ruling holds that the service provided access to the local telephone system and the privilege of telephonic quality communication with substantially all persons having a telephone constituting part of the local telephone system, because it allowed the subscribing businesses to make advertisements and otherwise communicate a message or information to anyone who placed a call to the service using the local telephone system. Revenue Ruling 89-84 involved a similar service, except the caller could hear stock quotes and related information in addition to the weather forecast. Thus, the Commissioner has addressed the incoming-only question on at least three occasions, and the court should have given deference to those long-standing rulings.

Additionally, the *USA Choice* court misapplied the holding in *Comdata* that the privilege, not the actual use by the taxpayer, governs taxability under the statute. The *USA Choice* court held that the PRI services at issue did not provide the necessary privilege because the taxpayer was able to communicate only with those local telephone system subscribers who (1) initiated a

call to [it], (2) had a modem, and (3) had a valid . . . username and password." Opinion at 19. We have already addressed the first point and shown that it is immaterial to the tax determination. The remaining two points are attributable solely to USA Choice's decision of how to use its PRI services, which ignores the actual capability of those services.

The *USA Choice* court's discussion concerning the use of a modem demonstrates a fundamental misunderstanding of both the statute and the PRI service. First, the statute requires only that the local telephone service provide "telephonic quality communication." According to Dr. Hills, any dial-up connection, including a connection made through PRI service, requires telephonic quality communication to function. (Expert report, Def. Ex. 1 at 3.) As further explained in his report, "[w]hen the dial-up user types information, such as [a] web address, into his computer, the computer converts the information into a series of tones which are transmitted to the [sic] Comcation's modem. Comcation will interpret the information request and, for instance, will retrieve a web page and transmit the data describing this web page back to the originating computer via a series of tones. These tones are designed to use the same set of frequencies as are required for normal voice communication and are familiar to users as the 'screeching' sound heard from the modem." (*Ibid.* at 3-4.) Thus, PRI service communication is of telephonic quality, which satisfies the statute.

Moreover, it is clear, based on the tariffs introduced in this case, that PRI service supports voice as well as data transmission. (Bell Atlantic tariff, Pl. Ex. 5 at 1; XO tariff, Def. Ex. 1 at A-27, para. 3.1.9(a)(1).) Therefore, the use of a modem instead of a telephone is not material. The ability to use the PRI service more expansively exists, whether or not Comcation opted to use it in other ways. As Dr. Hills explained, Comcation could have used a regular telephone with its

PRI service simply by replacing any one of its modems with a telephone set.[11] (Tr. at 95:18-96:15.)

Lastly, it is self-evident that a taxpayer's choice to limit access to its network to those with a valid username and password through the use of its own equipment does not negate the privilege provided by the service to communicate with any caller. Revenue Ruling 79-245, 1979-2 C.B. 380, established that the use of local telephone service is taxable even if the local service is only used for data transmission by a restricted number of verified users, because the service provided the privilege to communicate with substantially all persons in the local system even though a taxpayer may not exercise it. Additionally, it appears that the *USA Choice* court misunderstood the role of the external modem and password with respect to the PRI service. The court stated that "communication cannot occur until the caller supplies a recognized username and password." Opinion at 21. However, Dr. Hills testified that "communication" occurs between the modems to synchronize the transmission protocol even before any username or password is supplied. (Tr. at 99:4-16.) Thus, even callers without proper passwords could "communicate" with Comcation.

B. The *USA Choice* court erroneously held that the PRI services at issue in that case constituted private communication service within the meaning of § 4252(d)(1)(A).

The *USA Choice* court held that USA Choice's PRI services were private lines under § 4252(d)(1)(A) because they entitled it to the priority use of communication channels.

[11] Assuming Comcation's lines were configured to allow outgoing calls, which Comcation could have elected. As we explained in our post-trial brief, Comcation's PRI services could be configured as incoming, outgoing, or two-way with no difference in cost. Even after Comcation selected its initial configuration, it could be changed for a minimal fee.

According to the court, USA Choice demonstrated its priority of use by terminating a call when a caller failed to properly authenticate its username and password. Opinion at 28.

The court's holding is based on a misunderstanding of certain language in § 4252(d)(1). Namely, the language that exempts private lines and intercom systems from tax "regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c)." The court reads this language to mean that "tax-exempt 'private communication service' is broader than 'private lines.'" Opinion at 27. This may be true to the extent that a private line or intercom system can have access to a local telephone system and the privilege of communication with substantially all persons in that system *if* it is "*connected through switching*" with a separate local telephone service. Such is the case with the private line answering service in the Senate Report and the Centrex and PBX intercom systems. However, the court apparently believed that a private line may nevertheless qualify for the exemption where the private line *itself* is the very service that provides local telephone service through direct access to the public switch. That interpretation is incorrect. As is quite evident in the legislative history, local telephone service (or toll or teletypewriter service) provided in connection with a private line or intercommunication system is subject to tax. That is why Congress required there be separate charges for the local service and the private communication service; it is the reason the Centrex system did not immediately qualify for the exemption. The language of the statute leads to the same conclusion: "connected through switching with a service *described in subsection (a), (b), or (c)*." Services described in (a), (b), and (c) are taxed. Thus, the court incorrectly held that USA Choice's PRI services qualified for the exemption, even though they were essentially local telephone service.

The court's view of priority use with respect to USA Choice's PRI services is no different than a shopkeeper who decides to lock his store telephone in a safe and answer it only if one of his customers calls. In attempting to distinguish PRI service from the regular telephone service a homeowner might have, the court simply states, without further explanation, that PRI service is a "specially configured circuit for which there is a separate charge in addition to a charge for access to the local exchange." Opinion at 29. But the presence of a separate charge does not itself qualify a service for the exemption. The service must first satisfy the definition of private communication service under subsection (d)(1), (2), or (3); in other words, here, the service must provide "exclusive or priority use" of its channels within the meaning of the exemption.

In this regard, the court suggests that PRI service differs from other telephone service because they are not lines where "multiple telephone service subscribers would share the same loop on an equal basis. *See Telecomm. Glossary* at P-3." Opinion at 29. The court's assertion that a common homeowner shares the same loop on an equal basis with other local homeowners is incorrect. It appears that the court relied on page P-3 of the *Telecomm.s Glossary*, which refers to the definition of a "party line," where, indeed, several subscribers do share the same telephone line and dial tone on an equal basis. *Newton's* at 515 ("party line" and "party line service"), App. at A-12. But our example does not refer to party lines. Regular local telephone service used by most home and business owners is provided over a separate local loop, where the dial tone is not shared by more than one user. *Telecomm.s Glossary* at P-3 ("Party lines remain primarily in rural areas where loops are long."), App. at A-4; *Id.* at P-23 ("*Note*: Among subscribers to the public switched telephone network(s), the term *"private line"* is often used to mean a *one-party* switched access line.") (emphasis added), App. at A-5. Thus, the court failed to articulate any

meaningful distinction between the regular homeowner and a subscriber to PRI service as it relates to the issue of "priority" usage.

Finally, the court incorrectly found that there were separate charges for both local telephone service and private communication service by parsing through various line-item charges appearing in the invoices that all related to a single service provided by the telephone company. For example, the court erroneously equated "access charges" with local telephone service in holding that the invoices at issue contained separate charges for private communication services. However, access charges are charges that are permitted by the Federal Communications Commission to be made by local exchange carriers to compensate them for the use of their local networks by long distance carriers. *Newton's* at 26, App. at A-8. Contrary to the court's holding, the entire PRI service, along with its capabilities and their related charges, constitutes local telephone service. No private communication service was involved, and the court's holding otherwise is erroneous.

CONCLUSION

For the foregoing reasons, the Court should hold that Comcation's PRI services, including those provided by remote local exchanges, are taxable under § 4252(a) as local telephone service.

Respectfully submitted,

December 13, 2006
Date

s/Jacob Christensen
JACOB E. CHRISTENSEN
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-0878

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief
Court of Federal Claims Section
G. ROBSON STEWART
Reviewer

December 13, 2006
Date

s/G. Robson Stewart
Of Counsel

Attorneys for Defendant